648 F.2d 833
 8 Fed. R. Evid. Serv. 45
 Barry Lynn SEESE, Reinaldo Irizarry, Jr., Martin Ramos and
Marcos Torres, Administrator for the Estate of
Jose Torres, deceased, Appellees,
v.
VOLKSWAGENWERK A. G., a West German corporation and
Volkswagen of America, Inc., a New Jersey
corporation, Appellants.
 No. 80-1659.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 1, 1980.
Decided April 27, 1981.
 
 John T. Dolan (argued), Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for appellants.
 Harold Ungar (argued), John J. Buckley, Jr., Williams & Connolly, Washington, D. C., Henry H. Wallace, Wallace, Chapas & Gravina, Pittsburgh, Pa., for appellees.
 Before ADAMS, GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 This products liability action stems from a single car "roll-over" accident of a Volkswagen van. The plaintiffs sought to recover on causes of action sounding in strict liability, breach of warranty and failure to design a crashworthy vehicle. The case went forward on strict liability and "crashworthiness" theories. The jury awarded damages to the plaintiffs after finding that the vehicle's "ball cage" was defectively, although not negligently, manufactured and that the van's glass retention system was negligently designed, causing the plaintiffs' injuries to be significantly enhanced. Thus, in the district court the plaintiffs succeeded both on their strict liability and crashworthiness theories. The vehicle's driver was found to be free of negligence.
 
 
 2
 Although we affirm the jury's verdict, we do so only on the basis of plaintiffs' crashworthiness theory, as we do not read North Carolina law to provide a cause of action grounded on strict liability.[1]
 
 I.
 
 3
 On July 18, 1975, on a North Carolina highway, a single vehicle accident occurred involving a 1974 Volkswagen Van (Microbus Type II). Passenger Torres was killed. Ramos, who was driving the van, and passengers Seese and Irizarry were severely injured. Passenger Maldonado, the only occupant of the vehicle who was not ejected from the van, was only slightly injured. In the suit that was filed by Seese, Irizarry, Ramos and the representative of Torres, it was alleged that one Thomas J. Weir had forced Ramos off the road onto the shoulder of the highway. When Ramos attempted to steer the van back on to the road, the van overturned. All but one of the occupants of the Volkswagen were ejected from the van through the windows which "popped out." The plaintiffs' diversity action named Volkswagen of America and Volkswagen, A.G. ("VW") in addition to Weir as defendants.[2]
 
 
 4
 On appeal, VW argues that the district court erred in allowing the case to proceed on strict liability and crashworthiness theories and that significant trial errors require the granting of a new trial. Of the alleged errors asserted, VW stresses the exclusion of certain evidence by the district court concerning the non-use of seat belts by the plaintiffs and the district court's rulings that the requirements for proof of damages set out in Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976) were met by the plaintiffs. Additional errors claimed by VW include the admissibility of evidence introduced from the Fatal Accident Reporting System (FARS) and the relevance of a Federal Motor Vehicle Safety Standard. Finally, VW argues that the use of alternate jurors after deliberations had begun, gave the defendants a right to a new trial because of the technical violation of Federal Rule of Civil Procedure 47(b), which provides that alternate jurors shall be discharged after the jury retires to consider its verdict.
 
 II.
 
 5
 Section 402A of the Restatement of Torts, Second makes the seller or manufacturer of any product that is in a defective condition which is unreasonably dangerous[3] to the user or consumer or to his property, subject to liability for physical harm caused thereby, if the seller is engaged in the business of selling the product and the product reaches the user without substantial change. The rule applies even when the seller has used all possible care in preparing and selling the product and although there is no privity of contract between consumer and seller.
 
 
 6
 In 1965, the Restatement of Torts, Second was promulgated and from that time until the district court's decision in this case, forty-five states adopted the principle of strict liability in substantially the form described in § 402A of the Restatement. Moreover, during that period, no state Supreme Court ever rejected the strict liability theory.
 
 
 7
 With that circumstance as a backdrop, the district court ruled that the plaintiffs could assert the doctrine of strict liability in tort because it predicted that the North Carolina Supreme Court would adopt that doctrine when it was presented with that issue. Although North Carolina intermediate courts[4] had refused to accept the theory of strict liability in tort, the district court observed that in recent years the North Carolina Supreme Court had not precluded the use of that doctrine.
 
 
 8
 At the time of the district court's ruling, which predicted the adoption of strict liability by North Carolina, more than fifteen years had elapsed since the North Carolina Supreme Court decided Wilson v. Lowe's Asheboro Hardware, Inc., 259 N.C. 660, 131 S.E.2d 501 (1963). Wilson held that in North Carolina the obligation of a manufacturer to the consumer was governed by the law of negligence, not by any concept of strict liability. Against this background, the district court predicted that if the North Carolina Supreme Court were faced with the questions of whether it should apply a strict liability theory, it would reject its prior Wilson decision, and would follow the lead of the vast majority of states and would adopt § 402A as North Carolina law.
 
 
 9
 The district court, in reaching its conclusion, relied on National Surety Corp. v. Midland Bank, 551 F.2d 21 (3d Cir. 1977) which held that a federal district court, while it may not ignore the decision of an intermediate (state) appellate court, is free to reach a contrary result if by analyzing "other persuasive data; (it) predict(s) that the (North Carolina Supreme Court) would hold otherwise." Id. at 30. It did so without recognizing that here, the Supreme Court of North Carolina had already spoken to this issue (in Wilson), whereas in National Surety Corp. there had been no New Jersey Supreme Court decision which had dealt with the question that was in controversy there.
 
 
 10
 It was only after the district court's decision in this case, but during the pendency of this appeal, that the North Carolina Supreme Court in Smith v. Fiber Control Corp., 300 N.C. 669, 268 S.E.2d 504 (1980), refused to adopt the principle of strict liability in tort. In Smith, a personal injury action had been brought against the manufacturer of a machine which was responsible for injuring an employee who was working in a textile mill. The issue deemed dispositive by the Supreme Court of North Carolina was "whether there was sufficient evidence to carry the case to the jury on the question of contributory negligence." Id. at 507. In concluding that contributory negligence was properly submitted to the jury, the Court specifically addressed the issue of strict liability in product liability actions. Because the North Carolina Supreme Court's statement in this respect answers the arguments urged upon us by Seese, we quote this portion of Smith in full:
 
 
 11
 Finally, plaintiff and amicus curiae urge this Court to adopt the doctrine of strict liability in product liability actions. In response to this request, we note that recent comprehensive legislation in this area by the General Assembly does not adopt strict liability in product liability cases. See G.S. 99B-1, et seq. (the 1979 Products Liability Act). Significantly, the Products Liability Act specifically reaffirms the applicability of contributory negligence as a defense in product liability actions. G.S. 99B-4(3). Suffice it to say, that given the recent legislative activity in this area, we are not presently inclined to consider adoption of the rule of strict liability in product liability cases.
 
 
 12
 268 S.E.2d at 509-10.
 
 
 13
 Seese, on appeal, attempts to distinguish the clear impact of Smith. He argues that in Smith the Court was only asked to consider the preclusion of a defense of contributory negligence and was not asked to consider whether a rule of strict liability should be established. He also argues that the Smith court eschewed adoption of strict liability because the North Carolina legislation which was enacted, and to which the Court referred, utilized an implied warranty theory which can be equated with strict liability in some respects.[5]
 
 
 14
 However, as the opinion of the North Carolina Supreme Court which we quote above clearly indicates, that court did consider whether or not to adopt the rule of strict liability, and it refused to do so. Significantly, the Court also refused to preclude a contributory negligence defense, a defense which is normally unavailable to a defendant in a strict liability action.[6]
 
 
 15
 We also conclude that Seese's second argument, which seeks to equate strict liability with implied warranty in interpreting North Carolina's Products Liability Act, is without merit. Under West v. American Telephone and Telegraph Co., 311 U.S. 223, 236-37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940), a federal court must bow to the interpretation of the highest court of a state as "the final arbitor of what is state law." Here, the North Carolina Supreme Court has interpreted its own state statute in rejecting the theory of strict liability.
 
 
 16
 Moreover, even if the statute could be construed as adopting, rather than rejecting, the doctrine of strict liability, it would not have affected this case, because the statute explicitly provides: "This Act shall not affect pending litigation." N.C. Laws 1979, c. 654, § 7. In Wilson v. Ford Motor Co., Docket No. ST-C-80-2 (W.D.N.C. July 7, 1980), the court faced with this question held that " Section 99-B has no application to a claim for breach of implied warranties where the death of plaintiff's intestate occurred prior to October 1, 1979, the date Chapter 99-B became effective." Here, Seese's complaint was filed some 27 months before the Products Liability Act became effective. Because Seese's action was "pending litigation" which the Act could not affect, we need not reach the question of whether the implied warranty, as used in the Act, and strict liability of § 402A are but different names for the same theory under North Carolina law. We observe, however, that most jurisdictions do not treat these doctrines as identical concepts. Dawson v. Chrysler Corp., 630 F.2d 950 at 955, n. 5 (3d Cir. 1980).
 
 
 17
 Thus, even though the decision in Smith had not been announced when the district court in this case ruled that Seese could pursue a strict liability claim under North Carolina law, we are obliged to " apply state law in accordance with the controlling decision of the state's highest court," at the time of our decision. Baker v. Outboard Marine Corp., 595 F.2d 176, 182 (3d Cir. 1979) quoting Vandenbark v. Owens-Illinois Co., 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941).
 
 
 18
 Adhering to that instruction and applying Smith, it is evident that the district court erred in permitting the jury to consider this case on a strict liability theory.
 
 III.
 
 19
 Our conclusion that the district court erred in permitting the jury to consider the plaintiffs' strict liability claims is, however, not dispositive of this litigation. As we have noted previously, the plaintiffs pleaded a "crashworthiness" theory as well as a strict liability theory.[7] A recovery under the theory of crashworthiness would not be precluded by the district court's erroneous strict liability ruling. Under a crashworthiness theory, a manufacturer is liable for the additional injuries resulting from a product's negligent design, even if the defect which caused the injuries to be enhanced is not the same defect that caused the accident. Relating that concept to this case, damages for injuries which flowed solely from the overturn of the van (caused by the defective ball cage design) would be barred because Seese proved no negligence in the design of the unit and strict liability is not available in North Carolina, as we have discussed. However, damages resulting from the ejection of Seese and the other plaintiffs from the van, (which were the result of a negligently designed window retention system), could be recovered even though this latter defect was not the initial cause of the accident.[8]
 
 
 20
 Here, unlike the issue of strict liability which had been the subject of a North Carolina Supreme Court decision, albeit some 15 years prior to the instant action (Wilson v. Lowe's Asheboro Hardware, Inc.), the Supreme Court of North Carolina had at no time addressed or decided the issue of crashworthiness which confronted the district court in this case. We therefore approach this analysis as the district court did, by examining the decisions rendered by the only courts in North Carolina which have considered this issue and those cases upon which they relied.
 
 
 21
 For a short period, the Seventh Circuit case of Evans v. General Motors Corp., 359 F.2d 822 (7th Cir. 1966) generated a line of authority which held that a manufacturer is not liable for injuries that are merely enhanced but not caused by a defect in an automobile. Three federal district court cases in North Carolina, Simpson v. Hurst Performance, Inc., 437 F.Supp. 445 (M.D.N.C.1977), Alexander v. Seaboard Airline Railroad Co., 346 F.Supp. 320 (W.D.N.C.1971), and Bulliner v. General Motors Corp., 54 F.R.D. 479 (E.D.N.C.1971) followed the Evans holding. But as the district court noted, Evans itself was overruled in 1977 by Huff v. White Motor Corp., 565 F.2d 104 (7th Cir. 1977). Another district court in North Carolina in Isaacson v. Toyota Motor Sales, 438 F.Supp. 1 (E.D.N.C.1976), however, did not follow the Evans case, but rather had been persuaded by the rationale of an Eighth Circuit case, Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968). Larsen held that an automobile manufacturer is responsible for damages resulting from a negligent design defect, even if the defect did not cause the accident.
 
 
 22
 The Isaacson decision was filed in June, 1976 more than a year earlier than Simpson. Simpson, however, made no mention of Isaacson.[9] Thus, neither of the leading district court cases in North Carolina which confronted the crashworthiness doctrine issue ever analyzed the reasoning or logic of the other. Faced with the circumstance that North Carolina had no governing decision in this field, and had only conflicting district court decisions, the district court here found the reasoning of Isaacson to be the more persuasive. In Isaacson, Chief Judge Larkins of the Eastern District of North Carolina predicted that the North Carolina Supreme Court would find the arguments made in Larsen compelling, if it were to consider them. Thus, the plaintiff there was permitted to plead a crashworthiness theory and the defendant's motion to thus limit the scope of the plaintiffs' action, was denied.
 
 
 23
 The Larsen rule, which Isaacson predicted would become the law of North Carolina, and the cases which have followed Larsen, find no rational basis for distinguishing between injuries caused by automobile accidents wherein the defect caused the accident, as contrasted with injuries resulting from an accident where the defect enhanced the damages but did not cause the accident. Isaacson stated:
 
 
 24
 It is clear that a manufacturer owes a duty to the purchasers of its automobiles to design and construct an automobile that is reasonably safe to be driven on the highways and is devoid of defects which would cause accidents and subsequent injuries. The duty should also extend to designing and constructing an automobile which does not expose the occupants to an unreasonable risk of harm in the event that the automobile is involved in a collision.
 
 
 25
 438 F.Supp. at 7-8.
 
 
 26
 The history of automobile products liability law has been one which has taken into account the urgent need to provide incentives to manufacturers to take those steps necessary to minimize potential harm-causing defects. As the Seventh Circuit noted in overruling Evans, "The discernible trend in products liability law has been to increase the duty owed by manufacturers for injuries caused by their products." Huff v. White Motor Corp., supra at 109.
 
 
 27
 While it is hazardous, as we saw with respect to strict liability, to predict what the North Carolina Supreme Court might hold by simply totalling the number of states that have adopted a particular rule of law, we observe that in Huff v. White Motor Corp., supra at 110-111, the Seventh Circuit did compile a list of those cases following Larsen and those which followed Evans. Thirty jurisdictions were shown favoring the former, while only three followed the latter. The court in Van Tine v. Nissan Motor Co., Ltd., 463 F.Supp. 1274 (W.D.Pa.1979) at 1277 n.3 also took note of this tally. That court also questioned whether the Evans rule was still the law in West Virginia, one of the two states which still followed Evans despite its rejection by Huff. If West Virginia were to follow Huff, Mississippi would then be the sole remaining state clinging to the rule announced in Evans.[10] As the court noted in Bowman v. General Motors Corp., 427 F.Supp. 234 (E.D.Pa.1977) at 243 n.16, " the rejection of the principles of Evans v. General Motors (citation omitted) now seems well established." See also Comment, Automobile Crashworthiness: Evans Takes a Backseat, 21 Vill.L.Rev. 73 (1975-76). Most recently, in Fox v. Ford Motor Co., 575 F.2d 774 (10th Cir. 1978) the Tenth Circuit said that it seems likely that yet another state, Wyoming, would adopt Larsen, adding, at page 781, "(T)o follow the repudiated rule of Evans merely because it involves a second impact brought about by an original collision should not free the manufacturer. The effect of this would be to exempt the manufacturer from liability even if he were negligent."
 
 
 28
 In the absence of any expression by North Carolina and a split of authority by federal courts in that state, a prediction as to the law North Carolina would adopt can only be based on the greater persuasiveness of one of the conflicting theories, with an eye to the nationwide trend in judicial and legislative law-making. Having had the benefit of what we regard as unimpeachable logic in our own circuit's recent case of Huddell v. Levin, supra, which stated: "We take it as beyond peradventure that an automobile manufacturer today has some legal obligation to design and produce a reasonably crashworthy vehicle." 537 F.2d at 735, we are not disposed to base our prediction of North Carolina law on an outdated and repudiated doctrine. Like the district court here, we too are convinced that North Carolina is more likely to follow the enlightened rule of Larsen rather than the rule of Evans. Thus, we find no error in the district court's ruling that the plaintiffs could proceed on a crashworthiness theory.
 
 IV.
 A.
 
 29
 VW argues that the district court erred in not permitting VW to introduce evidence that the plaintiffs were not wearing seat belts at the time of the accident. VW contends that this evidence would show (1) that the non-use of seat belts meant that the plaintiffs were contributorily negligent; and (2) that the design of the vehicle with respect to "crashworthiness" was predicated on the availability and use of seat belts by the passengers.
 
 
 30
 Under North Carolina law, a failure of a plaintiff in an automobile torts action to wear seat belts may not be used as evidence to show contributory negligence. Miller v. Miller, 273 N.C. 228, 160 S.E.2d 65 (1968). Miller, recognizing that there is no common law duty for a motorist to routinely use seat belts, held that since failure to use a belt is not negligence per se, "it could be contributory negligence only when a plaintiff's omission to use the belt amounted to a failure to exercise the ordinary care which a reasonably prudent person would have used under the circumstances preceding that particular accident." Id. at 70.
 
 
 31
 The Miller court suggested that contributory negligence could only arise when a "plaintiff, with prior knowledge of a specific hazard one not generally associated with highway travel and one from which a seat belt would have protected him had failed or refused to fasten his seat belt."[11] Id. Thus, Miller, as it pertains to this case, leaves no room for a contributory negligence defense based on the plaintiffs' failure to wear seat belts.
 
 
 32
 However, VW seeks to distinguish the present case from a Miller situation because it claims that here it is the crashworthiness of the vehicle in a "second-collision" which is at issue. VW argues that, in such a case, seat belt evidence may be introduced, not to show that the plaintiffs were contributorily negligent with respect to the initial accident, but rather to show that seat belts were provided in the vehicle as a part of the vehicle's total retention system and, if used, would have prevented the "second collision" passenger ejectment and the damages that resulted therefrom. VW therefore contends that its seat belt evidence is not inconsistent with Miller and charges that the district court erred in failing to instruct the jury to consider whether or not plaintiffs' failure to wear seat belts was the proximate cause of the injuries, as was the case in Dawson v. Chrysler Corp., supra at 960.
 
 
 33
 There are two reasons why VW's argument must be rejected. First, Miller effectively precludes the raising of any seat belt contributory negligence defense in this type of case because there is no duty under North Carolina law to wear seat belts. The only exception to this rule is the specific hazard concept, an example of which we have noted in note 9, supra, but that exception is not presented here. Thus, starting from the premise that the failure to wear a seat belt cannot constitute negligence in North Carolina, it follows that no such failure may reduce a plaintiff's damages. Miller holds as much stating: "The same considerations which reject the proposition that a motorist's failure to fasten a seat belt whenever he travels is negligence, impel the rejection of the theories that such a failure should reduce his damages." Miller, supra, at 74.
 
 
 34
 Nor can it be argued, as VW does, that the plaintiffs, by failing to wear seat belts, have been deficient in proving proximate cause an element of their prima facie case. The jury here, as in Dawson, was instructed on proximate cause, and in this case found it in VW's design of the window retention system.[12] Indeed, the district court had removed from the jury's consideration any aspect of the case concerning seat belts, a matter that will be discussed below. Thus, on the basis of the evidence, the jury here was satisfied that all elements that the plaintiffs were required to prove to obtain a verdict predicated on negligence and proximate cause, had been satisfied. We cannot say that on the record as a whole, the jury's verdict which found that the glass retention system had been negligently designed, proximately causing the plaintiffs' injuries is unsupported. VW's argument that proximate cause was not proved in this case would lead to the illogical conclusion that had seat belts never been provided in the van, an identical accident giving rise to identical injuries would result in no damages recoverable by the plaintiffs because the element of proximate cause could not have been proved. We cannot accept this hypothesis any more than we can accept the argument advanced by VW here. In our view, the two circumstances are identical: the hypothetical absence of seat belts on the one hand and their non-use as permitted under North Carolina law on the other must necessarily lead to the same result.
 
 
 35
 Second, the district court not only permitted VW to question the plaintiffs about their use of seat belts, but the district court itself interrogated VW's principal expert witness, Mr. Pohl, on whether the van's window retention system was designed with seat belts as an integral component of the system. Mr. Pohl replied that the retention system was not designed with the assumption that seat belts would be used by the van occupants. The court's colloquy with Mr. Pohl is significantly revealing:
 
 
 36
 THE COURT: (I)s it (the van's window retention system) designed without regard for whether they will be wearing seatbelts or not wearing seatbelts?
 
 
 37
 THE WITNESS: That's correct, yes.
 
 
 38
 THE COURT: In other words, that is not within the contemplation of the designer or of the company, is that correct?
 
 
 39
 THE WITNESS: Yes, your Honor. (Supp. A. p. 66.)
 
 
 40
 The plain import of Pohl's testimony is that VW did not consider seat belts as an element of its window retention design that would tend to protect the occupants of a Type II van from ejection in a roll-over accident. Thus, we agree with the district court that it would have been irrelevant for the jury to consider the use of seat belts in deciding whether the window retention system was negligently designed. The district court recognized the significance of this testimony when it instructed the jury.
 
 
 41
 You will recall, ladies and gentlemen, that I permitted the issue of seat belts for a very limited purpose only. You will remember that I told you I would permit the question of seat belts only as it pertained to the reasonableness of the design. That is to say, was it reasonable for Volkswagen to design a windshield or side window retention system on the assumption that the occupants would be wearing seat belts? However, even that is no longer in the case, because you will remember the testimony of Mr. Pohl, who testified that Volkswagen in designing its windshield and its side window retention system did not assume that the occupants would be wearing seat belts. Therefore, there are no seat belt considerations in this case.
 
 
 42
 (Trial Transcript p. 7759).
 
 
 43
 In light of Mr. Pohl's testimony, VW has been remitted to arguing that the "trial court completely misconceived the testimony of Mr. Pohl." (Reply Br. p. 11, n.2) The record, however, does not support VW's characterization. We have independently reviewed the record and we are satisfied that it reveals without contradiction that VW did not design its window retention system with any thought of seat belts in mind. Thus, the district court did not err in its instruction given to the jury which reflects the record in this respect and the North Carolina law as we have discussed it.12a
 
 B.
 
 44
 A related question is whether the trial court properly applied the standards prescribed by this court in Huddell v. Levin, 537 F.2d 726, 737-38 (3d Cir. 1976). There, we held that in a crashworthiness or enhanced injury case, there must be proof of (a) an alternative, safer design, practicable under the circumstances; (b) the injuries, if any, that would have resulted had the alternative, safer design been used; and (c) the extent of enhanced injuries attributable to the defective design.
 
 
 45
 VW attacks the judgment of the district court because it views the testimony of plaintiffs' expert witness Dr. Brenner, who was produced by plaintiffs to satisfy the requirements of Huddell, as inadmissible and prejudicial. VW questions his expertise and Dr. Brenner's reliance on the depositions of two physicians in preparing his testimony. VW classifies Dr. Brenner as an "accident reconstructionist," qualified to describe the sequence of events surrounding an accident based on the laws of physics,[13] but not qualified to express an opinion on the cause of the plaintiffs' injuries.
 
 
 46
 As an auto safety engineer, with substantial credentials, Brenner was clearly qualified to testify as an expert on alternative, practical, safer designs for the van's window retention system, particularly since he had an extensive background in the development of safety performance standards for automobiles. Thus, Dr. Brenner's testimony during which he discussed alternative and safer designs for retaining windows in vans satisfied the first of the Huddell requirements.[14]
 
 
 47
 We are also satisfied that VW's objections to the plaintiffs' proof of the second and third Huddell requirements are not well taken. These Huddell factors both address the extent of a plaintiff's injuries. Under the second Huddell factor, proof is required of the injuries that would have been incurred had an alternative safer design been utilized. The third Huddell factor addresses the enhanced injuries incurred due to a defective design.
 
 
 48
 At the outset we recognize that the admission of expert testimony rests within the sound discretion of the district court and that the district court will be reversed only for an abuse of that discretion. We also recognize that Fed.R.Evid. 703[15] broadens and liberalizes the basis for expert opinions.[16]
 
 
 49
 VW argues that the district court erred not only in permitting Dr. Brenner to testify with respect to window retention design (the first Huddell requirement) but also that the district court erred in permitting him to testify with respect to the second and third Huddell considerations, i. e., the injuries that would have been suffered by the plaintiffs had a safer design been utilized and those that were suffered by the plaintiffs because of their ejection from the van. VW argues that the medical evidence required to satisfy the second and third Huddell factors must be provided by medical experts and charges that Dr. Brenner, in formulating his opinion relied not only on facts which he acquired from two physicians but that he also relied on the physicians' opinions.
 
 
 50
 We are not persuaded by VW's arguments in light of the standard provided by Rule 703 and the standard by which we test the district court's discretion. As an accident reconstruction expert, Brenner was competent to testify about the manner and circumstances surrounding the ejection of the plaintiffs from the van. Thus, his testimony about where the bodies landed and how the plaintiffs incurred their injuries is clearly within the scope of his expertise. Accordingly, the district court properly exercised its discretion in admitting Dr. Brenner's testimony that, had the integrity of the window retaining system been maintained and had the windows therefore remained in the vehicle, the plaintiffs would not have been injured. Buttressing this testimony is the fact that the one occupant of the vehicle who sustained no injuries was Maldonado, who was the only occupant not ejected from the van. All the other occupants, who were ejected, suffered grave injuries or death.[17] Moreover, Dr. Brenner could, pursuant to Rule 703, base his opinion as to the cause of plaintiffs' injuries on the physicians' testimony which appears in their independently admissible depositions. Rule 703 permits his opinion to be formulated by use of the facts, data and conclusions expressed by the physicians.
 
 
 51
 Based on our review of the record, and in particular Dr. Brenner's testimony, we are satisfied that appropriate relevant evidence was produced by the plaintiffs with respect to each of the standards set forth in Huddell concerning alternative safer design, injury causation, and injury enhancement. Thus, the district court acted within its discretion in properly admitting this evidence and in ruling that the Huddell standards had been met.
 
 C.
 
 52
 We turn next to two contentions made by VW in which VW complains that the district court improperly admitted at trial evidence of the FARS report and evidence of Safety Standard 212. VW's brief characterizes the FARS information and its use as follows:
 
 
 53
 The Fatal Accident Reporting System (FARS) is statistical information pertaining to fatal accidents operated under the auspices of the National Highway Traffic and Safety Administration ("NHTSA"). Dr. Robert Brenner requested such information pertaining to Volkswagen, Ford, Chevrolet and Dodge vans. The raw data received, in the form of computer printouts, were received in evidence as exhibits P-159 and P-160.
 
 
 54
 The raw data purportedly show the greater likelihood of ejection from a Volkswagen van compared to competitive vehicles, thereby corroborating the erroneously allowed evidence of Brenner based on Camps' drawings.
 
 VW brief at 42.[18]
 
 55
 VW objects to the admission of the FARS data on three grounds: (1) surprise; (2) non-comparability of the vans and the accidents; and (3) lack of original records, as required by Fed.R.Evid. 1006. The district court found that VW was not surprised by the introduction of the FARS data and our review of the record and that ruling reveals that the district court did not abuse its discretion in this respect.
 
 
 56
 Addressing VW's third ground of objection pertaining to the lack of original records, it appears that the FARS data were produced as certified copies of official records and were therefore admissible as public records under Fed.R.Evid. 1005[19], as well as being admissible under the Business Records Act (28 U.S.C. § 1732) and under Fed.R.Evid. 703. See note 16, supra. The district court so held, and we agree. This leaves for our consideration VW's challenge to the FARS data based on non-comparability of the accidents and vehicles reflected in that data base.
 
 
 57
 VW complains that the FARS report did not reveal the speed at which the accidents occurred; whether the accidents were single vehicle accidents or accidents involving impacts with another vehicle; the "how" and in what manner the ejections occurred, as well as a number of other variables. The district court, apparently agreeing that variables did exist nevertheless admitted the FARS data in evidence, ruling that VW's objections went to the weight of the evidence and not to its admissibility. In so ruling, the district court stated:
 
 
 58
 Of course, these accidents will have happened in different ways and under different circumstances. And, of course, that has to be taken into account when you deal with weight. But when you have such a significant difference between ejections of Volkswagens versus the others, coupled with the fact at least according to his testimony that the others are abiding by 212 standards, while Volkswagen is not, this is something, then, for the jury to evaluate in judging whether or not a reasonably prudent manufacturer would have abided by 212 standards whether applicable to them or not.
 
 
 59
 (Trial Transcript p. 1603).
 
 
 60
 We have reviewed the exhibits and testimony and it is clear that the VW van in issue here was similar to the other Type II vans which are the subject of the FARS reports. Indeed VW makes no affirmative assertion and points to no proof that the window placement of the van in this case differed significantly from the vans reported in FARS. We conclude that the district court's evidentiary rulings with respect to the FARS report were proper.
 
 
 61
 VW's second claim with respect to documentary evidence involves the admission into evidence of Federal Motor Vehicle Safety Standard 212, 49 C.F.R. § 571.212 which establishes retention requirements for windshield mountings, but not for "multi-purpose passenger vehicles" like the VW Type II. The court and both parties were aware that the VW Type II van was not required to meet the Standard 212. This "exemption" was not because window retention was regarded unimportant or impossible on vehicles such as the VW van, but rather because the windshield of the van, due to its unique configuration would shatter on impact with the frontal barrier that was used in the test. VW argues that this exemption meant that the Standard was wholly irrelevant to a VW Type II van. The district court, however, permitted the Standard to be considered by the jury in deciding whether VW had taken those measures reasonably necessary to make the van's windshield resistant to a "pop-out" during an accident. It took special care to caution the jury in this respect:
 
 
 62
 In this regard I wish to caution you, however, that the mere failure to comply with the Standard is, itself, not evidence of any negligence on the part of the defendants herein, since that Standard did not apply to the accident vehicle at the time of manufacture. The Standard simply constitutes evidence which, together with all the other evidence before you with regard to the design of the windshield and window retention systems, can be taken into account by you in assessing whether the defendants herein have breached their duty of care owed to the plaintiff.
 
 
 63
 (Trial Transcript p. 7755).
 
 
 64
 The plaintiffs claim that even though VW could not perform the Standard 212 test because of the van's configuration, it could, nevertheless, satisfy the retention requirements of the standard. In this connection, the plaintiffs claim VW's own crash tests revealed that glued-in windows met the Standard. (Seese Br. at 38.) Even without regard to the crash test claim made by the plaintiffs, we are satisfied that the district court's carefully crafted instruction was sufficient to permit the introduction of the Standard into evidence for the limited purpose explained by the district court.D.
 
 
 65
 VW has raised on this appeal a number of additional arguments. These arguments challenge the district court's rulings on different points of evidence. VW also claims to have been prejudiced by juror exposure to a television program.[20] We have reviewed each argument made and we are satisfied that the district court neither erred nor abused its discretion in its rulings.
 
 E.
 
 66
 Finally, we must consider whether the trial was tainted by the district court's failure to dismiss alternate jurors at the commencement of the jury's deliberations and the district court's subsequent substitution of alternate jurors subsequent to the commencement of the jury's deliberation.
 
 
 67
 Fed.R.Civ.P. 47(b) provides that "an alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Here, however, all parties agreed that the alternate jurors would not be discharged after the jury began its deliberations. One day after this consent was given, snow delayed the arrival of two jurors. Two alternate jurors were then substituted for the two absent jurors and all jurors were instructed to start their deliberations anew. The delayed jurors appeared three minutes after the reconstituted jury was sent to deliberate.
 
 
 68
 From our vantage point we are in no position to second guess the district court judge with respect to the time he allowed before taking action to replace the two delayed jurors. This is a matter peculiarly within the district court's discretion. While it now appears that a little more patience would have prevented VW's challenge to the trial's conduct, we cannot say that the district court judge abused his discretion. We recognize, as did he, that at the time his decision was made to substitute alternates for the two tardy jurors, he was doing so against the background of a prior agreement of the parties. Moreover, as we have noted the district court instructed the jury to begin its deliberations anew after the substitutions were made. Subsequently, VW moved for a mistrial and the district court judge replied:
 
 
 69
 when both sides say that they will be content with a certain procedure there is nothing that I know of, no reason why I know of, that the Court cannot accede to it, provided it doesn't violate some sort of public policy. This, obviously does not.
 
 
 70
 more than simply a contract by agreement, we have in this instance an estoppel. It was with your consent that we didn't wait for the remaining jurors but in fact substituted the alternates and let the deliberations go forward.
 
 
 71
 I don't think, in all fairness, that you can be heard now to ask for a mistrial for a procedure which you have for two days now endorsed fully and which in reliance thereon, the entire trial has gone forward on that basis.
 
 
 72
 Not only that, but with full knowledge and awareness, because I said yesterday that I could do it only by consent, because the rules didn't authorize it.
 
 
 73
 Under these circumstances, in a case such as this, where the trial has gone forward for ten and a half weeks, I guess the plaintiffs are individuals whose resources are obviously finite, they are suing one of the great corporations of the world, a mistrial in such circumstances is the equivalent of total victory, or so close thereto as to be without distinction for the corporation. Under these circumstances, where the corporation, ably represented, elects to proceed on a certain course, not only with imputed knowledge but with actual knowledge because I said so yesterday, that they didn't have to, when twice with that actual knowledge they go forward and endorse a procedure, they cannot be heard later to underdo (sic) it all to the extent that a ten and a half week trial gets washed out, 7500 pages of record get torn up, thousands of pages of exhibits are heaved aside, and the plaintiffs, who are crippled, severely injured as a result of an accident, must do it over again. That result would be unconscionable. Therefore, I have to reject your application.
 
 
 74
 (Trial Transcript p. 7837-38).
 
 
 75
 VW calls our attention to Truscott v. Chaplin, 403 F.2d 644 (3d Cir. 1968) where the court there recognized the mandatory nature of Rule 47(b) in stating that "(o)ur Rule 47(b) requires that the alternate jurors 'shall be discharged after the jury retires to consider its verdict.' " Id. at 645.
 
 
 76
 However, other courts have retained alternate jurors and allowed them to be substituted providing consent was given to this practice. The Fifth Circuit, in Latex Supply Co. v. Freuhauf Trailer Civ. Freuhart Corp., 444 F.2d 1366 (5th Cir. 1971), cert. denied, 404 U.S. 942, 92 S.Ct. 287, 30 L.Ed.2d 256 (1971) allowed an alternate juror to attend the jury's deliberations so that he might be substituted as juror in the event a regular juror was excused to attend a funeral. Counsel for both parties agreed. Based on their agreement the court found no error. See also United States v. Barone, 83 F.R.D. 565 (1979). Moreover, it has been held that a defendant in a criminal case may waive the requirements of the analogous rule governing alternate jurors in criminal trials.[21] United States v. Davis, 608 F.2d 698 (6th Cir. 1979), cert. denied, 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 602 (1980).
 
 
 77
 In Davis, the court had not discharged an alternate juror. The jury after several hours of deliberations was excused for the night. The following morning, one of the regular jurors did not report because of a death in the family. After the several courses of possible action were outlined, the defendant asked that the alternate juror be substituted for the regular juror. The jury was reinstructed and later returned a verdict of guilty. The court held in a per curiam opinion that the defendant had waived any right to object to the substituted juror and that consequently no prejudice resulted. In holding that the defendant was bound by his consent, the court recognized that a waiver could operate to permit substitution of an alternate juror after deliberations had begun. See also United States v. Baccari, 489 F.2d 274, 275 (10th Cir. 1973), cert. denied, 417 U.S. 914, 94 S.Ct. 2614, 41 L.Ed.2d 218 (1974); Leser v. United States, 358 F.2d 313, 317 (9th Cir. 1966), cert. dismissed, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966); and see United States v. Lopez, 581 F.2d 1338, 1342 (1978).
 
 
 78
 The district court, here, was careful to negate any adverse effect that deliberations might have had on the substituted alternate jurors. It instructed the jurors: "I want you to begin your deliberations anew. Actually, you hardly had started them yesterday. You didn't get these materials until nearly a quarter to 3:00, and you were in here twice before 5:00 o'clock. Start all over again. Take a fresh look at everything, begin discussing this thing." (Trial Transcript p. 7825).
 
 
 79
 Accordingly, we hold that under the circumstances present here, it was not error to allow the waiver of Rule 47(b) by consent of the parties.
 
 V.
 
 80
 The dissent argues forcefully that because of the difference in damages that may result from a strict liability claim as opposed to an enhanced injury (crashworthiness) claim, a remand is indicated for a new trial on damages, limited to the crashworthiness claim. Were this issue properly before us, and had the evidence reflected a difference in damages, we could not disagree with that suggested course. However, VW on this appeal did not raise this issue and indeed, at trial, did not object to the form of the interrogatories submitted to the jury. United States v. 564.54 Acres of Land, 576 F.2d 983 (3d Cir. 1978) rev'd on other grounds, 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979).
 
 
 81
 Of greater significance, however, is the fact that the evidence in this case, contrasted with the more usual crashworthy case, does not support a distinction between strict liability damages and enhanced injury damages. In the usual case, it is customary to find that injuries were suffered on initial impact and were subsequently enhanced by the so-called "second collision." Here, however, testimony was adduced at trial to the effect that had the van windows not been negligently designed and had they thus remained in the vehicle, the plaintiffs would not have been ejected, and would not have been injured. The dissent does not challenge this testimony of Dr. Brenner which, fairly read, compels the conclusion that the damages sustained by the plaintiffs were no different under either theory. Trial Transcript at 1672. Substantiating this testimony as we note at pp. 845-846, supra, is the fact that Maldonado, the one passenger who was not ejected from the vehicle, suffered no injuries. Thus, while in the usual crashworthy case a difference in damages is expected, here the jury had evidence before it that no injuries would have been suffered, and hence no damages would have occurred, had the plaintiffs not been ejected from the vehicle, even though the vehicle overturned.
 
 
 82
 In light of this evidence, it is not surprising that the jury found that the negligent design of the window retention system was "the proximate cause of the injuries which were sustained by (each plaintiff)." Typescript at 842. Accordingly, on this record, we conclude that there is no need for a retrial on damages.
 
 VI.
 
 83
 We conclude that the only error committed by the district court was to permit the jury to consider whether the defendants were liable under a theory of strict liability. That error, as we have pointed out, resulted from the district court's prediction of how the North Carolina Supreme Court would rule on that issue. That court, as we have discussed, rejected strict liability as the law of North Carolina, but it did so after the district court had ruled in this case. Accordingly, the plaintiffs' and the district court's reliance on the strict liability theory was misplaced.
 
 
 84
 However, the jury also returned a verdict finding that VW had negligently designed its window retention system which had proximately caused the plaintiffs' injuries. We conclude on the basis of our analysis of the crashworthiness theory that the North Carolina Supreme Court would adopt that theory when it is presented. Thus, we hold that the district court properly submitted the crashworthiness claim of the plaintiffs to the jury and we affirm the jury's verdict on that ground.
 
 
 85
 We also hold, after consideration of the other errors asserted by VW, that the district court did not err and thus should be sustained in its rulings. Accordingly, the judgment of the district court will be affirmed.
 
 
 86
 ADAMS, Circuit Judge, dissenting.
 
 
 87
 Recognizing that we are dealing with issues that have come to the fore after a lengthy trial and subsequent to the painstaking efforts of the trial judge to resolve difficult questions about the development of tort law in North Carolina, it is with some hesitance that I dissent from the panel's disposition of this appeal.
 
 I.
 
 88
 At a minimum, I believe that removal of the strict liability claim from the controversy necessitates a remand for a new trial on damages. As the majority correctly notes, the Erie principle mandating that state substantive law governs in diversity actions, requires that "until such time as a case is no longer sub judice, the duty rests upon federal courts to apply state law in accordance with the then controlling decision of the highest state court." Vandenbark v. Owens-Illinois Co., 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941) (emphasis added); Baker v. Outboard Marine Corp., 595 F.2d 176 (3d Cir. 1979). Consequently, the recent state supreme court decision in Smith v. Fiber Control Corp., 300 N.C. 669, 268 S.E.2d 504 (1980), handed down subsequent to the trial court judgment, which refused to adopt the principle of strict liability in tort, vitiates the district court's prediction that North Carolina would embrace the strict liability theory. I therefore agree with the majority's holding that it was error for the district court to permit the jury to consider the plaintiffs' strict liability claim. But I cannot adhere to the ultimate conclusion reached by the majority that the misplaced reliance on the strict liability theory in no way affected the outcome of the litigation. For assuming arguendo that VW is still liable on the crashworthiness theory, it does not follow that the damages assessed against VW would remain unaltered after the strict liability claim has been eliminated.
 
 
 89
 As the trial judge explained to the jury, VW was potentially liable under two tort theories, but the damages recoverable under each claim involved different amounts. Thus, as the judge correctly instructed on the strict liability count, "if you find there was a defect in the right rear ball cage at the time of its manufacture and sale, and that this defect was the proximate cause of the accident, you are to award damages to the plaintiffs in an amount that will compensate them for all the injuries they sustained as a result of the entire accident." (emphasis added) In contrast to the strict liability theory, under which VW would be responsible for all ensuing damages, under the crashworthiness theory VW would be liable only for injuries which exceeded those that would have occurred had the manufacturer designed a reasonably safe and suitable vehicle. See Huddell v. Levin, 537 F.2d 726, 740 (3d Cir. 1976).[1] That is, in the words of the trial judge,
 
 
 90
 you are to award damages under the second theory (if you only find under the second theory) only for the enhanced injuries which plaintiffs received as a result of any negligent design which you find.
 
 
 91
 You are not to award plaintiffs damages for the total amount of injury they sustained as a result of the entire accident if you find the defendant liable only on the second theory of liability." Trial Transcript 7764. (emphasis and parentheses added)
 
 
 92
 Having excised the strict liability claim from the case, I do not understand how the majority can now ignore both case law and the plain directive of these instructions, which make clear that VW is not liable for damages in full when crashworthiness is the only foundation for negligence.
 
 
 93
 It is suggested that defendants are foreclosed from raising this damage point because they did not object to the instructions or interrogatories. The defendants however, cannot be faulted for failing to object to the instructions dealing with liability. Their position throughout the trial, as well as on appeal, was that North Carolina law did not embrace strict liability or crashworthiness doctrines, and that the trial court erred in its analysis of the probable evolution of state law. The problem we address here arose after the instructions had carefully distinguished the two causes of action; it comes about primarily as a result of the interrogatories that were posed to the jury by the trial judge. Once the jury found VW liable under each distinct theory of liability, it was then simply asked to assess damages with respect to each individual plaintiff in a lump sum. Notwithstanding the jury finding of liability under both the strict liability and crashworthiness theories, on a hindsight basis it may be contended that it would have been preferable to insist on two separate damage assessments given that the instructions on liability and proximate cause had addressed each claim individually.[2] But to penalize VW for not demanding two distinct computations, and to require VW to pay for damages not authorized by North Carolina law, would place an unfair burden on defendants in the unusual situation here.
 
 
 94
 Inasmuch as the North Carolina Supreme Court had not settled at the time of trial either the availability of strict liability or of crashworthiness causes of action in North Carolina, VW had consistently attacked the district court's predictions respecting the eventual acceptance of each of these doctrines. And on appeal VW continued to argue that erroneous legal predictions and instructions with respect to either theory so infected the trial that judgment for defendants, or a new trial, was required. Conversely, plaintiffs maintained that if the verdict is sustained as to either of their theories, then the judgment in toto should be affirmed.[3] Neither party contemplated anything other than an all-or-nothing judgment. In holding VW liable for damages in full, then, based on its failure to demand separate computations in the form of discrete interrogatories, the majority is in effect requiring the defendants to foresee the nearly inscrutable: namely, that the appellate court would overturn the district court's legal forecasts regarding North Carolina law with respect to strict liability but not concerning crashworthiness. Any other outcome upholding both theories, upholding the strict liability but not the crashworthiness, or invalidating both theories would have produced the all-or-nothing results that the respective parties envisaged.
 
 
 95
 Moreover, it was the plaintiffs who proceeded under two theories of liability a course ultimately proved by the highest court of North Carolina to be incorrect. And as prescribed by Huddell, under the crashworthiness theory the burden was on the plaintiffs to establish what injuries were attributable to the accident itself and what injuries were sustained solely on account of the defective window system. See Huddell v. Levin, 537 F.2d 726, 738 (3d Cir. 1976). Because, under Huddell, the applicable procedure required plaintiffs to prove enhanced injuries that is, those that would not have occurred but for the defective design it would appear reasonable that plaintiffs be required to carry the parallel burden of protecting their liability theory with sufficiently specific interrogatories on damages. It would seem unfair, at least to me, to permit plaintiffs' pursuit of two causes, one valid and one invalid, to convert the defendants' limited, second collision liability into plenary liability for all consequences of the accident. Yet, with the present disposition, the majority does just that.[4]
 
 
 96
 In the absence of a remand, the Court is faced with either attempting to segregate two damage figures from an indivisible lump sum, a task beyond our ability to perform, or with making the implausible assumption that all the damages incurred by the plaintiffs resulted from the defective window retention system. Yet this hypothesis rests on the belief that had VW designed a reasonably safe and suitable window system none of the injuries for which the jury assessed damages would have occurred. The majority, pointing to testimony by one expert witness that had the windows not been negligently designed no injuries whatsoever would have been incurred, apparently adheres to this supposition. See maj. op. infra at 849. However, this ignores the testimony of another expert, who was unwilling to speculate as to whether the injuries received by some of the plaintiffs occurred inside or outside the van.[5] If the injuries were suffered inside the van, they would have occurred regardless of the allegedly defective window system. Moreover, the majority's hypothesis assumes that the jury drew the same conclusion as the one expert, an inference which, as I view it, is impermissible for an appellate court to make.
 
 
 97
 In attempting to buttress its position, the majority notes that Alexander Maldonado, the one passenger who was not ejected, suffered only minor scratches and bruises. However, the evidence suggests that Maldonado escaped injuries by falling into the space beneath the dashboard, an area capable of protecting only one person.[6] Not only is it uncertain that a reasonably safe, alternative window design would have prevented the ejection of the plaintiffs in fact, there was considerable evidence to the contrary[7] but it is far from clear that plaintiffs' fate, had they managed to stay inside the vehicle, would have resembled that of Maldonado.
 
 
 98
 While the rationale underlying the crashworthiness theory that manufacturers should be liable for accidents regardless whether the defect actually caused or merely enhanced the damages has merit,[8] such a theory was not intended to impose upon manufacturers the duty to produce a vehicle incapable of exacerbating injuries.[9] Rather, liability under the crashworthiness theory extends only to the injuries that a safer, economically feasible design reasonably would have prevented that is, had the window retention system been somewhat sturdier and more resilient. Cf. Dawson v. Chrysler Corp. 630 F.2d 950 (3d Cir. 1980). Such a theory of liability, as articulated in Huddell, requires a remand for an assessment of damages for injuries suffered solely on account of the negligent design in the window retention system.
 
 II.
 
 99
 The second aspect of the majority opinion which I find disquieting is the analysis of the crashworthiness claim that the trial court originally adopted and that the majority accepts today. For the district court, in removing all seat belt considerations from the case,[10] and the majority here, in agreeing that "it would have been irrelevant for the jury to consider the use of seat belts in deciding whether the window retention system was negligently designed," appear to have misconstrued the concept of crashworthiness. Simply acknowledging that the jury found the negligently designed window retention system to have proximately caused the plaintiffs' injuries, as the majority seems to do, does not relieve us from the obligation of posing the prior inquiry: was it error for the trial judge to eliminate totally the presence of seat belts from the jury's considerations of the crashworthiness of the van?
 
 
 100
 I fully agree that North Carolina law, as set forth in Miller v. Miller, 273 N.C. 228, 160 S.E.2d 65, 70 (1968), precluded in this type case a contributory negligence defense with respect to the initial accident based on a failure to wear seat belts. But Miller in no way prohibits the introduction of evidence concerning the presence of seat belts insofar as such evidence pertains to the reasonableness of the van design for purposes of the crashworthiness or second collision theory. Indeed, the district judge attempted to adhere to this view in his early instructions to the jury. He explained:
 
 
 101
 To the extent that seat belts are relevant at all in this case, their relevance is only as to whether or not it was reasonable for those who designed the retention power of these windows to assume, if they did assume, that occupants of Volkswagens, type 2 van, would wear seat belts
 
 
 102
 In other words, in deciding whether or not there was negligence in the design of the window, you have a right to take into consideration whether or not in designing the window the architects or the designers took into account that people would be wearing seat belts and perhaps even more importantly for this case, whether or not, if they did assume people would be wearing seat belts, such an assumption was reasonable on their part. Trial transcript 2103-04.
 
 
 103
 Even this perspective which focuses on the rationality of VW's assumption that people might wear seat belts may be an unduly narrow view of the crashworthiness concept.
 
 
 104
 For the question of defectiveness for purposes of a crashworthiness analysis is a uniquely contextual one. As Judge Aldisert stated for the Court in Huddell v. Levin:
 
 
 105
 Ordinarily, where a product malfunctions and itself precipitates injury, there is little problem in establishing a defect; the issue frequently is whether the defect is traceable to the defendant manufacturer However, in a crashworthy case, impugning the design of the product in question, the difficulties are reversed. There can be no doubt that the design of the product is traceable to the manufacturer. The central issue is: was the product "defective"? And this can only be evaluated in the context of a particular risk.
 
 
 106
 537 F.2d at 740.
 
 
 107
 Thus, for the jury to determine whether the window system was reasonably designed for the purposes for which it was sold requires expanding the scope of inquiry beyond the abstract seatbelt-window design relationship. An evaluation of the possible defectiveness of the window system, in light of the vehicle as a whole and in the particular circumstances of a rollover, is necessary.
 
 
 108
 Similar to the test advanced by Judge Aldisert in Huddell, other courts have also emphasized that the jury be instructed in resolving defective design issues to consider the vehicle as a whole in the context of a given accident. Thus, in Dreisonstok v. Volkswagen, A.G., supra, in which plaintiffs sued for enhanced injuries sustained when a VW microbus crashed into a telephone pole, the court noted that any crashworthy case necessarily involves a balancing of many factors including price, particular type of vehicle, and circumstances of the accident "to determine whether the manufacturer had used ordinary care in designing a car, which, giving consideration to the market purposes and utility of the vehicle, did not involve unreasonable risk of injury to occupants " 489 F.2d at 1073. And as the court in Dyson v. General Motors Corp. recognized, the differentiation between various models means "that a convertible can not be made as safe in roll-over accidents as a standard four-door sedan with center posts and full-door frames." 298 F.Supp. 1064, 1073 (E.D.Pa.1969). To the same effect, in Wilson v. Volkswagen of America, 445 F.Supp. 1368 (E.D.Va.1978), which involved a single car rollover, the court viewed crashworthiness as a holistic, contextual concept: "any vehicle should be made as safe as it reasonably can, considering its special purpose and 'intended use'; but standards of safety themselves must take into account the utility of the vehicle." 445 F.Supp. at 1372. Crashworthiness then relates back to the reasonableness of the entire vehicle at the time of its manufacture, although it is necessarily assessed in the context of an actual accident, which may not have been foreseeable.[11]
 
 
 109
 With respect to the crashworthiness claim before us, the existence of seat belts was relevant to the question of reasonableness of the window design in the context of a rollover accident. For this reason, the ruling by the district court that totally removed such evidence from the jury, constitutes error.[12] The majority opinion has excerpted a portion of the pointed interchange between the district court and VW's expert witness, Mr. Pohl, in which Mr. Pohl stated that the window retention system was designed without regard to whether the occupants would be wearing seat belts. See maj. op. supra at 843-844. This colloquy formed the basis for the court's conclusion that, inasmuch as Volkswagen, in designing its windshield and window retention system, did not assume that occupants would be wearing seat belts, evidence relating to the availability of seat belts was improper. See Trial Transcript at 7759. Given the Huddell directive and the above discussion of crashworthiness, however, this assumption does not dispose of the question whether in the context of this particular risk a rollover at a high speed the window design plus the existence of the seat belts provided a reasonably crashproof vehicle.
 
 
 110
 While Mr. Pohl's response is arguably subject to several interpretations, no possible construction justifies removing all seat belt considerations from the jury's determination of crashworthiness. The statement by Mr. Pohl plausibly suggested that VW neither assumed that passengers would nor assumed they would not wear seat belts. It says nothing about whether in a high-speed rollover situation seatbelts are perhaps the most reasonable and efficient means of protecting against injuries, and whether any window design can guard against accidents of such severity. In fact, examination of the entire course of Pohl's testimony manifests a position that it was unreasonable to rely upon the windows to retain occupants in a rollover accident.[13] It would therefore, at least to me, appear improper on the crashworthiness issue to remove evidence regarding the availability of seatbelts and the reasonableness of plaintiffs' nonuse of them from the jury based on the isolated statement of an expert witness that the VW window retention system was designed without regard to whether occupants would or would not be wearing seat belts.
 
 III.
 
 111
 As the entire concept of crashworthiness indicates, each vehicle constitutes a special design and each accident constitutes a rather singular circumstance, often posing problems not easily analogized to earlier torts cases. The consequent difficulty in providing comprehensive standards to govern such a range of contingencies coupled with continuing technological advances and design modifications, may explain why Congress did not intend federal motor vehicle safety standards to be all-inclusive. As we acknowledged in Dawson v. Chrysler Corp., supra, Congress explicitly provided that " 'Compliance with any Federal motor vehicle safety standard issued under this subchapter (National Traffic and Motor Vehicle Safety Act) does not exempt any person from any liability under common law.' 15 U.S.C. § 1397(c) (1976)." 630 F.2d 950, 958 (3d Cir. 1980). Yet the problems generated by the present case ultimately serve to underscore the perception in Dawson: the existing system for assessing liability and compensating injuries in automobile accident cases, which permits individual juries under different state systems to arrive at discrepant outcomes that impose conflicting standards on manufacturers, is far from efficient or fair.
 
 
 112
 The case before us illustrates the inefficiencies and inequities created by the uneven evolution of state tort law doctrines and the absence of uniform federal standards in the automobile field. The conscientious efforts of the district court here to anticipate the course of North Carolina tort law proved futile. A state supreme court decision handed down after the trial was completed peremptorily negated a careful attempt at judicial extrapolation. Divergent state tort laws produce similarly arbitrary, stochastic outcomes for injured plaintiffs. Had the accident occurred in any state but North Carolina, and two others which have not yet adopted section 402A of the Restatement, a strict liability cause of action would have been available. And predictability and uniformity in the governing law, quite obviously, would have eliminated many of the difficulties which confront us on this appeal.
 
 
 113
 As we indicated in Dawson, the irrationalities in the existing system affect the automobile manufacturers as well. The ultimate effect of jury verdicts which reach beyond federal safety standards and are arrived at under different state laws, is the imposition of conflicting requirements on producers attempting to satisfy a nationwide market. In the course of the present trial VW found itself caught between Scylla and Charybdis, so to speak. On the one hand, VW's obligations were measured by national statistics which are arguably inappropriate for this type accident or this type van.[14] On the other hand, the jury assessing liability was guided by insufficiently articulated state law. Yet, VW is now bound by this jury verdict, arrived at under North Carolina law and based on potentially inapplicable federal standards, a verdict which may prove to be at variance with what some later jury in another state decides. The absence of precise and comprehensive national standards, exacerbated by the vagaries of different states' laws, leaves us far from the goal of reducing and fairly distributing the sum of accident costs as well as the costs of reducing the number of future collisions.
 
 
 114
 It would appear, then, that injured parties, manufacturers and the public would all benefit from greater certainty and consistency in the governing law and the concommitant efficiency in its administration. Indeed, manufacturers might well consent to more rigorous safety standards in exchange for a guarantee that they would be applied nationwide in an evenhanded manner. And equally important, the public would benefit from a concerted attempt to reach a national consensus on the conflicting goals of productivity, energy conservation and passenger safety.
 
 
 115
 Unfortunately, given the existing adjudicative system, I am compelled to comment primarily upon the appropriateness of a remand for a reassessment of damages, and to point out why it appears necessary to retry the crashworthiness claim to permit incorporation of seat belt evidence into the jury assessment of the reasonableness of the vehicle's design.
 
 
 
 [1]
 The parties agreed at the outset that this case was governed by the law of North Carolina
 
 
 [2]
 Weir is not a party to this appeal. An order of the district court on August 27, 1979 approved a settlement between the plaintiffs and Weir
 
 
 [3]
 Some states, in adopting the Restatement rule, have dropped the "unreasonably dangerous" requirement. See e. g., Azzarello v. Black Bros. Co., Inc., 480 Pa. 547, 391 A.2d 1020 (1978) and Suter v. San Angelo Foundry and Mach. Co., 81 N.J. 150, 406 A.2d 140 (1979)
 
 
 [4]
 We are aware that as recently as 1979 a North Carolina Court of Appeals had noted in Fowler v. General Electric Co., 40 N.C.App. 301, 252 S.E. 862, 864 (1979) that the North Carolina courts had "not embraced the doctrine of strict liability in tort." Later, the Court of Appeals of North Carolina in Cockerham v. Ward, N.C.App., 262 S.E.2d 651 (1980) again implicitly rejected the theory of strict liability
 
 
 [5]
 The relevant section of the North Carolina statute implicated in this argument reads:
 A claimant may bring a product liability action directly against the manufacturer of the product involved for breach of implied warranty; and the lack of privity of contract shall not be grounds for the dismissal of such action.
 N.C.Gen.Stat. § 99B-2(b).
 
 
 [6]
 The jury in Smith had found the plaintiff guilty of contributory negligence and thus the Supreme Court of North Carolina, by ruling as it did, affirmed the jury's verdict which barred Smith's claim
 
 
 [7]
 The parties throughout this litigation have referred to this theory as the theory of "crashworthiness" that is, that there is a legal obligation imposed upon a manufacturer to design and produce a reasonably crashworthy vehicle. Huddell v. Levin, 537 F.2d 726, 735 (3d Cir. 1976). The district court judge characterized this theory as one of "injury enhancement." Because the two terms are interchangeable, in the course of this opinion we will refer to this theory as the crashworthiness theory, a theory describing liability for negligence that has caused injuries, but not the initial accident
 
 
 [8]
 The district court in explaining the crashworthiness doctrine to the jury charged in part:
 When you have completed your deliberations on plaintiffs' first theory of liability and have answered the interrogatories that pertain to that theory, you will then proceed to deliberate on plaintiffs' second theory of liability. Recall that the two theories are separate and independent. Thus, you must consider plaintiffs' second theory of liability regardless of your action on the first theory.
 Now, plaintiffs' second theory of liability is that the design of the windshield and windshield retention mechanism in the 1974 Volkswagen were unreasonably dangerous in that it permitted the plaintiffs to be ejected, thereby causing greater injury to them than they would have received had they remained inside the microbus when it rolled over on July 18, 1975.
 Another name for this theory of liability is crashworthiness. Crashworthiness involves the relative ability of a vehicle to protect its occupants during the second collision, which refers to the second collision of the occupant after the accident sequence has begun.
 At this stage you are deliberating on the question of whether the defendants breached a duty to the plaintiff, as I will outline in a moment, to prevent or diminish the enhancement of injuries plaintiffs would have sustained as a result of the initial accident no matter who was at fault in the initial accident or no matter who was responsible for the initial accident.
 In plain English, what that means, the doctrine of crashworthiness does not depend on who was responsible for the initial accident; rather, it pertains to whether or not the vehicle was properly designed to minimize, rather than enhance, injuries to occupants in an accident no matter what the cause of the accident.
 In order to find the defendant liable under a crashworthy or second collision theory based on the design used in the windows and windshield retention systems of the 1974 Type 2 vehicle, you must find that the plaintiffs have proved by the greater weight of the evidence that the defendant was negligent in the design in question.
 (Trial Transcript p. 7747-48).
 
 
 [9]
 We can only surmise that the reason Simpson failed to cite Isaacson was because Isaacson, although filed earlier was not officially reported until it appeared in 438 F.Supp. This was subsequent to the date that Simpson, which was filed later than Isaacson, was reported in an earlier volume, 437 F.Supp
 
 
 [10]
 Recently two more federal district courts in North Carolina dealt with this issue and reached opposite results
 In Sealey v. Ford Motor Co., 499 F.Supp. 475 (E.D.N.C.1980), the court said, " this Court does not feel that the cited cases give any guidance as to what the Supreme Court of North Carolina would do with the issue here presented." Id. at 478. The Sealey court went on to say, "(f)aced with the obvious split of authority in the Federal Courts sitting in North Carolina and the near unanimity of opinion elsewhere, I cast my vote make my prediction of what the Courts of North Carolina would do if faced with this issue in favor of the plaintiffs and adopt the Larsen doctrine. This Court is of the opinion that the reasoning behind the rule set out in Evans is unrealistic and would not be followed by the North Carolina Courts." Id. at 479.
 In Wilson v. Ford Motor Co., Docket No. ST-C-80-2 (W.D.N.C. April 9, 1980), the court followed Alexander v. Seaboard Airline Railroad Co., 346 F.Supp. 320 (W.D.N.C.1971) and rejected the Larsen rule. Id. at 6.
 
 
 [11]
 The example given by the Miller court involved " a case in which the defendant driver tells the plaintiff passenger to buckle his seat belt because the door on his side has a defective lock and might come open at any time. The passenger fails to buckle the belt and, in consequence, falls out of the automobile when the door comes open on a curve." Miller v. Miller, 273 N.C. 228, 160 S.E.2d 65, 70 (1968)
 
 
 [12]
 The jury, here, was required to answer the following special interrogatories which relate to proximate cause in the crashworthiness context. Each interrogatory was answered "yes."
 Was Volkswagen negligent in the design of the windshield retention system in question?
 Was Volkswagen negligent in the design of the side window retention system in question?
 If negligent, was that negligent design for windshield and/or window retention the proximate cause of the injuries which were sustained by (each plaintiff)? (emphasis added)
 Trial Transcript p. 7853-54.
 12a The dissent argues that the district court erred in not permitting consideration of seat belts as one of several factors to be considered by the jury in determining whether the design of the Volkswagen was defective. In support of this thesis the dissent cites Wilson v. Volkswagen of America, 445 F.Supp. 1368 (E.D.Va.1978). However, this case is distinguishable from Wilson.
 First and foremost, in this case VW's own expert testified that seat belts were not considered in the design of the window retention system. No such evidence is revealed in Wilson. Second, the court in Wilson acknowledged that had Virginia law proscribed seat belt testimony in mitigation of damages as Minnesota's and Tennessee's statutes provide, Wilson would have reached a different result. 445 F.Supp. at 1374. Here, North Carolina law as set forth in Miller v. Miller, 273 N.C. 228, 160 S.E.2d 65 (1968), not only rejects contributory negligence based on a motorist's failure to wear a seat belt, but also explicitly rejects, just as do the statutes cited in Wilson, any theory that such a failure may be used to reduce the injured plaintiff's damages. Miller at 74.
 
 
 [13]
 VW describes this role in its Reply Brief at 20:
 An accident reconstruction expert's expertise allows him to determine "the sequence of events by application of the laws of physics and known behavioral characteristics of the vehicle in conjunction with the circumstances of the accident. The pertinent data may include impact damage, the length and nature of tire marks, the location of the point of collision and of positions of rest of the vehicles, the speed of the vehicles, and the maneuvers, if any, which had been performed." 1 Frumer and Friedman, Products Liability, § 6.05(4) at 104.5 (1975)
 
 
 [14]
 For example, the windows in the overturned van were not retained with adhesive. Dr. Brenner advocated retaining windows by use of glue or metal clips (Trial Transcript p. 1672). Indeed, as we discuss in part IV.C infra, VW successfully tested vans with glued-in windows
 
 
 [15]
 As Judge Godbold, writing for the Fifth Circuit in Bauman v. Centex Corp. 611, F.2d 1115 (5th Cir. 1980) stated "In general, whether facts relied on by an expert are in evidence, or ever could be in evidence, is not relevant. The pertinent inquiry under Rule 703 is whether the facts are of a type reasonably relied on by experts in the particular field. The object of this inquiry is of course to determine the reliability of the expert's testimony." Id. at 1120. This concept is explained in the Note of the Advisory Committee on Proposed Rules, 56 F.R.D. 183 (1972):
 The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other factors, hospital records and xrays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.
 Id. at 283.
 
 
 [16]
 Rule 703 provides:
 The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
 
 
 [17]
 Government statistics were introduced in evidence which demonstrated that the likelihood of fatal injury is substantially enhanced if the occupants of a vehicle are ejected
 
 
 [18]
 In "D" infra, we hold that the district court did not abuse its discretion in permitting Dr. Brenner to testify with respect to the Camps drawings
 
 
 [19]
 F.R.Evid. 1005 reads:
 PUBLIC RECORDS
 The contents of an official record, or of a document authorized to be recorded or filed and actually recorded or filed, including data compilations in any form, if otherwise admissible, may be proved by copy, certified as correct in accordance with rule 902 or testified to be correct by a witness who has compared it with the original. If a copy which complies with the foregoing cannot be obtained by the exercise of reasonable diligence, then other evidence of the contents may be given.
 
 
 [20]
 As they appear in VW's brief on appeal, the particular points of error are listed as follows:
 The exclusion of prior inconsistent statements made by Alexander Maldonado unduly allowed the deposition testimony of Alexander Maldonado to have greater credibility than it deserved.
 The Court erroneously refused to allow defendants to read in the deposition of Brenton Smith.
 The trial court erred in that it erroneously allowed irrelevant, immaterial and prejudicial evidence to be introduced against defendants while at the same time it erroneously excluded probative, relevant evidence for defendants.
 The Court improperly allowed Frank Camps to testify on behalf of plaintiffs, as plaintiffs failed to identify Mr. Camps as an expert until the eve of the trial.
 The trial court improperly inquired of Frank Camps on the subject of cost-benefit analysis.
 The trial court erroneously permitted Byron Bloch to testify regarding irrelevant and inadmissible patents.
 The Court erred in allowing Reinaldo Irizarry's "Day in the Life Film" into evidence and raised the false issue of bifurcation.
 The jury during the trial was exposed to a television program, highly critical of defendants, on which plaintiffs' expert appeared all to the prejudice of defendants.
 The Court improperly compelled Ian Ceresney, Esq., to testify at trial.
 
 
 [21]
 The relevant portions of Rule 47(b) of the Fed.R.Civ.P. and Fed.R.Crim.P. 24(c) are identical, and both read:
 An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.
 
 
 [1]
 The trial court and counsel for plaintiffs agreed that the burden of proof with regard to the crashworthiness claim would be guided by Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976). See J.A. 490
 Two alternate denominations for the crashworthiness concept the enhancement or second collision theories further emphasize that liability under such a doctrine does not make one responsible for all injuries occasioned by the initial accident, but only for those that could have been prevented by an alternate, safer design. See Huddell v. Levin, 537 F.2d 726, 740 (3d Cir. 1976); Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066, 1069, 1076 (4th Cir. 1974).
 
 
 [2]
 Fed.R.Civ.P. 51, which precludes a party from assigning "as error the giving or failure to give an instruction unless he objects thereto," refers to instructions but makes no mention of interrogatories
 
 
 [3]
 Although this may represent an aggressive plaintiff strategy, it ignores significant differences in the damages recoverable under the two liability theories
 
 
 [4]
 As to the majority's contention that VW did not raise on appeal the point that damages under strict liability and crashworthiness theories amount to two distinctly different sums, it is suggested that VW's argument that the instructions on strict liability and crashworthiness were erroneously given and infected the entire proceedings with prejudicial error is sufficiently broad to encompass this claim. See Defendants-Appellants Brief at 11, 12 n.2, 14
 
 
 [5]
 See J.A. 1125-26
 
 
 [6]
 See Defendants-Appellants Reply Brief at 22
 
 
 [7]
 See JA 2173-75; 2297-2303; 2569-71
 
 
 [8]
 Issacson v. Toyota Motor Sales, 438 F.Supp. 1, 7 (E.D.N.C.1976)
 
 
 [9]
 See Sklar, "Second Collision" Liability: The Need for Uniformity, 4 Seton Hall L.Rev. 499, 527 (1973)
 
 
 [10]
 See Trial Transcript p. 7759
 
 
 [11]
 Contrary to the majority's suggestion, the Wilson case is cited only for the proposition that a jury should give cognizance to the full design of the automobile, including safety factors, in determining whether an automobile is crashworthy. There is no intent to adopt the Wilson court's mitigation of damages analysis which limited evidence on the non-use of seat belts to the determination of damages. As the trial court made clear crashworthiness and mitigation of damages are two clearly distinct concepts
 
 
 [12]
 The very rationale for admitting evidence pertaining to Safety Standard 212, namely that although VW was not bound by the standard, it was a jury question whether adherence to the standard constituted reasonableness in design, see Trial Transcript 7754-55, should similarly dictate admission of the seat belt evidence. Although plaintiffs were not bound to wear seat belts, evidence of their availability and non-use would properly be factors for the jury to consider in assessing crashworthiness
 
 
 [13]
 See JA 2173-75; 2292; 2297-2303; 2569-71; 2575-76
 
 
 [14]
 It is still unclear whether the Fatal Accident Reporting System (FARS) data relied upon here, while perhaps relevant, are derived from accidents analogous to the one in issue. See Trial transcript 1595-1603. Nor is it certain that the Federal Motor Vehicle Safety Standard 212, 49 C.F.R. § 571.212 (1978) introduced in the proceedings below, was intended to apply at all to the Type II van. See Trial transcript 1603, 7754-55