**ANTILLES INSURANCE, INC., Appellant/Cross-Appellee**

**v.**

**RICHARD JAMES and JANIS JAMES, Appellees/
Cross-Appellants**

Civil App. No. 1992-27

Territorial Court Civ. No. 432-1990

District Court of the Virgin Islands

Div. of St. Croix

July 6, 1994

STACY L. WHITE, ESQ., (BRYANT, WHITE & ASSOCIATES, P.C.), Christiansted, St. Croix, V.I., *for Appellant/Cross-Appellee*

WARREN B. COLE, ESQ., VINCENT A. COLIANNI, ESQ., (HUNTER, COLIANNI, COLE & TURNER), Christiansted, St. Croix, V.I., *for Appellees/Cross-Appellants*

MOORE, *Chief Judge*, District Court of the Virgin Islands; BROTMAN, *Sr. Judge* of the United States District Court for the District

of New Jersey, Sitting by Designation; and SWAN, *Judge* of the Territorial Court of the United States, St. Thomas and St. John Division, Virgin Islands, Sitting by Designation.

On Appeal from the
Territorial Court of the Virgin Islands

## OPINION OF THE COURT

This matter is before the Court on the appeal of Antilles Insurance, Inc. ("Antilles") from the Civil Division of the Territorial Court, wherein appellees ("the Jameses") were awarded $146,486, consisting of $96,486 in lost insurance proceeds, $10,000 for extended loss of use of their home, and $40,000 for emotional distress. The case had been submitted to the jury on the theory that Antilles was negligent in not disclosing information about its close affiliation with American Alliance Insurance Company, Ltd. ("American Alliance") before insuring the Jameses' property with American Alliance. The Territorial Court set aside the award for emotional distress and both parties appealed.

Appellant Antilles claims that the trial court erred:

A. in entering judgment for the Jameses when the evidence showed that appellant was not negligent as a matter of law, specifically in certain evidentiary rulings:

(1) in admitting into evidence the Krassner memo, written by an officer of both American Alliance and Antilles, that confirmed earlier instructions to renew all policies upon expiration with American Alliance, as it was irrelevant, unduly prejudicial and lacked probative value,

(2) by refusing to give the jury a curative instruction to disregard the testimony of Theresa Gaskin, offered as a rebuttal witness to confirm that the Krassner memo had been implemented, even though the trial court recognized the "poisonous effect" of her testimony,

(3) in admitting into evidence the Bell Nicholson complaint, initiated by American Alliance against its reinsurer and alleging that the broker should have been aware of the high risk exposure facing American Alliance before Hurricane Hugo devastated the U.S. Virgin Islands, since it was hearsay, unduly prejudicial and lacked probative value,

(4) in accepting Frandelle Gerard as an expert on reinsurance when the Jameses failed to establish that she was qualified,

(5) by refusing to admit testimony of Herbert Zack, an officer of both American Alliance and Antilles, proffered to demonstrate Antilles' knowledge and state of mind regarding the financial posture of American Alliance;

B. in not applying the "Collateral Source Rule" to reduce the Jameses' recovery by funds paid or to be paid by or on behalf of American Alliance, a joint tortfeasor;

C. in entering judgment for "loss of use" damages; and

D. in awarding attorneys' fees to the Jameses.

The Jameses cross-appealed that the trial court erred:

E. in granting judgment notwithstanding the verdict on the jury's award of damages for emotional distress where Antilles failed to move for directed verdict at the close of all the evidence as required by Fed. R. Civ. P. 50(a), and

F. in refusing to award prejudgment interest on the award of special damages for the loss of insurance proceeds where the amount of such damages was not stipulated and the time when such money should have been received by the Jameses was fixed as a matter of law.

This Court has carefully reviewed all of the issues raised, and for the reasons stated below, the judgment of the Territorial Court is reversed in part, affirmed in part, and remanded with instructions for the limited purposes indicated.

## FACTUAL BACKGROUND

The underlying facts are briefly stated. In January, 1989, the Jameses owned a home at No. 56, Estate St. George, Frederiksted, St. Croix, U.S. Virgin Islands, and approached Antilles Insurance, Inc. to obtain homeowners insurance on their behalf. The Jameses had been insured by another insurance company through another agency until their policy was not renewed. American Alliance was a locally-owned Virgin Islands company incorporated and licensed to do business in the United States Virgin Islands, which shared the same stockholders, directors, and officers as Antilles. Antilles made the determination that American Alliance was the only company that would provide insurance for the Jameses based on the underwriting information they provided, and insured the Jameses with that company. American Alliance had begun operating as a surplus line carrier in the U.S. Virgin Islands and later became a

235

fully licensed insurance company, able to underwrite all lines of property and casualty insurance as reported by the Government of the Virgin Islands. Antilles did not disclose to the Jameses that Antilles and American Alliance had the same stockholders, directors and officers, or that over 90% of the company's risks were located in the United States Virgin Islands.

In September 1989, the Virgin Islands were ravaged by Hurricane Hugo, a Category V hurricane, which decimated the island of St. Croix. Claims filed with American Alliance exceeded $20,000,000 as a result of hurricane storm damage. Although its total assumed risk before Hugo exceeded $87,000,000, there was only $7–8 million, including reinsurance, available to pay off claims after the hurricane. The Jameses' home was virtually destroyed by Hugo. Their claim for property damage was adjusted and submitted to the company on November 24, 1989 for $96,486. With insufficient funds to pay most claims resulting from Hurricane Hugo, including the Jameses', American Alliance was put in conservatorship.

The Jameses sued Antilles for negligent failure to provide information in violation of Antilles' duty to them as their insurance agent. After a three-day trial, the jury awarded the Jameses $146,486, consisting of the adjusted property damage claim of $96,486, $10,000 for extended loss of use of their home, and $40,000 for emotional distress. The trial judge partially granted Antilles' motion for judgment notwithstanding the verdict by setting aside the award for emotional distress. This appeal and cross-appeal ensued.

## DISCUSSION

Both parties present a multitude of issues on appeal. The interdependency of the issues raised and our findings regarding the Territorial Court's holdings on these issues require related issues to be analyzed and determined together.

A. *Antilles' Negligence*

■■ The main issue of this appeal is whether the trial court correctly instructed the jury and whether the jury properly determined that Antilles was negligent pursuant to those instructions. Antilles contends that it was entitled to judgment in that it was not negligent as a matter of law since the Jameses failed to carry their

236

burden of proof that Antilles owed them a duty that was breached and that the breach was the cause of the Jameses' injuries. Since there is no controlling local law on this issue, we go to the Restatements of Law.[1] Restatement (Second) of Agency § 381 details the duty of an agent to give information to its principal:

> Unless otherwise agreed, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to affairs entrusted to him and which, as the agent has notice, the principal would desire to have and which can be communicated without violating a superior duty to a third person.[2]

Comment a. is relevant:

> a. *When duty is inferred.* An agent may have a duty to act upon, or to communicate to his principal or to another agent, information which he has received, although not specifically instructed to do so. The duty exists *if he has notice of facts which, in view of his relations with the principal, he should know may affect the desires of his principal as to his own conduct ....* (emphasis added).

If an agent (Antilles) has information which it should know *may* affect the desires of its principal (Jameses), it is bound by law to disclose that information to the principal. Id., cmt. a.

Recognizing this provision, the trial judge instructed on the issue of negligence as follows:

> The law imposes a duty on an agent such as Antilles Insurance, Inc. to give persons such as Mr. and Mrs. James information which is relevant to the affairs entrusted to the agent and of which the agent knows or ha[s] reason to know that the customer or client would desire to have.
>
> In determining whether Antilles Insurance, Inc. breached a duty in failing to give information to Mr. and Mrs. James, which it had a duty to give, you must consider the following ...; was such information relevant? ...; was such information known to Antilles Insurance, Inc.? Or should it have been known to Antilles Insurance, Inc. through the exercise of reasonable efforts on its part? ...;

---

[1] V.I. Code Ann. tit. 1, § 4.

[2] No issue of violation of a superior duty to a third person has been raised by either party in this case.

*whether Mr. and Mrs. James would have wanted to have that information communicated to them. . . . In other words, if you find that* after Mr. and Mrs. James bought the insurance policy, that Antilles learned of facts which were relevant to the selection of American Alliance and *which Mr. and Mrs. James would have desired to know, you may find that Antilles Insurance, Inc. was negligent in failing to give them this information. . . .*

App. II at 479–81 (emphasis added).

■■ We find that this instruction accurately states the law and correctly advised the jury how to consider the evidence on the issue of negligence. United States v. McGill, 964 F.2d 222, 235–36 (3d Cir. 1992).[3] We now review the sufficiency of the evidence in the record to determine if the jury was properly allowed to consider the issue of negligence or whether the lower court should have taken the issue from the jury and entered a judgment in favor of appellant as a matter of law pursuant to Fed. R. Civ. P. 50. Antilles' failure to disclose its relationship with American Alliance to the Jameses, if Antilles was acting not only on behalf of the Jameses as its principal but also on behalf of American Alliance, if supported by the evidence, would allow a finding that Antilles was negligent under section 381.

The Jameses presented evidence to support the duty of Antilles to disclose information relevant to the affairs the Jameses entrusted to them and the damages resulting from that nondisclosure along the following lines:

1) the conflict of interest resulting from the financial interest of Antilles, through its common shareholders, officers and directors, to place the Jameses' policy with American Alliance and thereby retain 100% of their premium, rather than have a portion of the premium go to another company;

2) the knowledge possessed by Antilles by virtue of this commonality regarding:

---

[3] While the jury charge regarding applicable law is subject to plenary review, when the substantive legal content of the instruction given by the trial judge accurately states the law, a court's refusal to use specially requested language is reviewed for abuse of discretion. United States v. Salmon, 944 F.2d 1106, 1125 (3d Cir. 1991), cert. denied, 112 S.Ct. 1213 (1992); Savarese v. Agreess, 883 F.2d 1194, 1202 (3d Cir. 1989).

a) American Alliance's financial condition

b) the concentration of American Alliances' covered risk in the U.S. Virgin Islands, and

c) the foreseeability of a major hurricane by American Alliance; and

3) the potential availability of insurance from other companies.

■ This Court has thoroughly reviewed the evidence presented at trial and, assuming it was properly admitted, concludes that this evidence was amply sufficient to support the jury's verdict of negligence, namely, that Antilles failed to disclose to the Jameses that it was acting not only on behalf of the Jameses, but also for its commonly owned affiliate, American Alliance. We now turn to the challenges to the admissibility of this evidence raised by appellant in order to complete this review of the legal sufficiency of the evidence.

(1) *Admissibility of the Krassner Memo*

The Krassner memo, written by Antilles' Vice-President, who was also Vice-President of American Alliance, and directed to managers of Antilles' two offices, confirmed earlier instructions that all policies previously insured by another insurance company, Guardian Insurance Company, were to be renewed with American Alliance upon their expiration.[4] Exhibit No. 12, App. III at 655. Antilles argues that the court erroneously admitted the memo into evidence, since it lacked relevance and was highly prejudicial.[5] Appellees retort that they offered the memo to demonstrate Antilles' conflict of interest and propensity to subordinate its clients' interests to the interests of its commonly shared officers, directors, and shareholders.

---

[4] The Memo was dated September 5, 1989.

[5] The Memo was issued eight months after Antilles placed the James' policy with American Alliance, and Antilles contends that the time lapse between the Memo and the Jameses' coverage made its admission unjustly prejudicial. Since the Memo states that it "confirm[s] my instructions . . . ." (emphasis added) App. III at 655, it was incumbent upon Antilles to show that this highly relevant document was unduly prejudicial because the procedure prescribed in the Memo was put in place after the Jameses' policy was issued. This was not done and the date of the Vice-President's original instruction being confirmed by the memo was not elicited. Accordingly, the Court has no basis for determining that it was unduly prejudicial.

239

■ We find that the memo was undoubtedly relevant under the broad scope of Fed. R. Evid. R. 401 to demonstrate Antilles' alleged breach of duty. United States v. Clifford, 704 F.2d 86, 90 (3d Cir. 1983); United States v. Steele, 685, F.2d 793, 808 (3d Cir. 1982); Carter v. Hewitt, 617 F.2d 961, 966 (3d Cir. 1980). Not only does the Memo serve as clear evidence of the common financial interests of American Alliance and Antilles, but in addition, the Memo further demonstrates the blatant, adverse nature of those financial interests to the interests of Antilles' other principal, the Jameses. A clearer conflict of interest would hardly be imagined. Accordingly, we find that the Krassner Memo was highly probative and properly admitted by the lower court.

(2) *Theresa Gaskin's Testimony*

■ As a collateral issue, Antilles raises the trial court's failure to give the jury a curative instruction regarding Mrs. Gaskin's testimony, offered to rebut appellant's representations through its witnesses, Steve Nelson and Herbert Zack, that the Krassner Memo was never implemented.[6] Upon objection by Antilles, the court found that the value of the testimony was outweighed by its prejudicial effect pursuant to Fed. R. Evid. 403, and sustained the objection. App. II at 379. When Antilles requested after the close of all the evidence that the jury be given "a precautionary instruction regarding [Ms. Gaskin's] testimony," the court indicated that since no request was made earlier, no precautionary instruction would be given. App. II at 425. Antilles contends that once the trial court recognized that Ms. Gaskin's testimony should not have been permitted, the Court was compelled to give a curative instruction for the jury to disregard her testimony. Antilles made no request for instruction during Ms. Gaskin's testimony, and the underlying issue of admissibility regarding Ms. Gaskin's testimony was never presented by the Jameses on cross-appeal. We do not find that the collateral rebuttal testimony heard by the jury compels this Court to reverse the lower court's decision based on a failure to give a curative instruction.

---

[6] App. II at 367–80. Mrs. Gaskin's testimony demonstrates that the memo was implemented, contrary to appellant's witnesses' assertions. When her policy with another company expired, Antilles, without her knowledge or consent, renewed it with American Alliance.

(3) *Introduction of the Bell Nicholson Complaint*

Compelling evidence produced at trial demonstrating the conflict created by the commonality of American Alliance's and Antilles' representatives was introduction of the complaint in a lawsuit filed in New York in May, 1990 by American Alliance. The Jameses introduced the testimony of one of Antilles principals and an officer of American Alliance, Herbert Zack, that American Alliance had initiated a separate action against its reinsurance broker, Bell Nicholson, and successfully introduced the complaint into evidence over Antilles' protest. App. I at 175. The Jameses contend that Mr. Zack first mentioned the existence of this action on direct examination, thus opening the door for the complaint's introduction at trial.[7]

At trial, Antilles' only challenge to its admission was that the complaint was hearsay, which the Territorial Court Judge overruled because it merely demonstrated the existence of the pending lawsuit. The judge also noted that the complaint was an admission by a party-opponent pursuant to Fed. R. Evid. R. 801(d)(2). App. III at 700.

▆▆▆ On appeal, Antilles argues that the complaint lacks probative value and is unduly prejudicial.[8] Because this Court has no indication that its lack of probative value and undue prejudice were alleged at the trial level, a more stringent standard of review is employed by the appellate court. When there was no contemporaneous objection regarding an allegation presented for the first

---

[7] App. I at 101–103 (read into the record at trial by the James' attorney). The majority of Mr. Zack's deposition, including voluntary statements made during direct examination, was read into the record by Antilles' attorney later in the trial. App. II at 276, 301. Antilles has not denied the contention that the first testimony referring to the Bell Nicholson Complaint was made by Antilles' witness, Mr. Zack, on direct examination.

[8] See App. III at 700. In its brief, Antilles cites various cases that state the "well-settled" proposition that pleadings are inadmissible hearsay that have no probative force or evidentiary value, but the two cases relied on do not support Antilles' contention. Century "21" Shows v. Owens, 400 F.2d 603, 609–10 (8th Cir. 1968); Stevenson v. Hearst Consol. Publications, Inc., 214 F.2d 902, 907 (2d Cir. 1954). In both, the parties bringing the complaints were not the same parties in the actions where the complaints were offered as evidence. In fact, one of those cases would support the admission of the complaint where the party to the second case had filed the pleading in the other action. Century "21" Shows v. Owens at 610.

241

time on appeal, the plain error standard is employed. Plain error or defect is demonstrated only if the claimed error affects a substantial right and had an unfair impact on jury deliberations. United States v. Pervez, 871 F.2d 310, 315 (3d Cir.), cert. denied, 492 U.S. 925 (1989) quoting United States v. Young, 470 U.S. 1 at 16–17 (1985). The standard is implemented to remedy potential miscarriages of justice, and is sparingly applied. The Bell Nicholson complaint alleges that American Alliance's unique geographic market, combined with the foreseeability of a catastrophic hurricane hitting the Virgin Islands and causing widespread damage, and the disparity of the reinsurance program which in turn created high risk exposure since 90% of its policies were written to cover risks in the Virgin Islands, led to the demise of American Alliance and its inability to pay its claims.[9] App. III at 656–668; see also Ex. 18, App. IV at 767. Because the Bell Nicholson complaint expresses the foreseeability of a hurricane such as Hugo hitting the Virgin Islands and American Alliance's precarious financial position that the geographic risk exposure would precipitate given that foreseeability, we find that the complaint was probative. This information, known to Antilles through the commonality of its officers with American Alliance, was clearly something the Jameses would have wanted to know before being insured by American Alliance.

 Antilles contends that Mr. Zack's knowledge of the allegations in the Bell Nicholson complaint, gained as an officer of American Alliance, cannot be imputed to Antilles through his position as president of Antilles, without disregarding their separate corporate organizations.[10] Antilles urges upon us the view that the only way

---

[9] App. II at 301. In the deposition (read into the record at trial by Antilles' attorney), Mr. Zack blamed American Alliances' situation on bad advice from insurance intermediaries.

[10] Antilles cites a Fifth Circuit case that states the corporate veil may only be pierced for issues of liability to avoid fraud, unfairness or injustice. Pan Eastern Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1130–35 (5th Cir. 1988). The Third Circuit agrees that "the appropriate occasion for disregarding the corporate existence occurs when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime". American Bell Inc. v. Federation of Tel. Workers, 736 F.2d 879 (1984), quoting Zubik v. Zubik, 384 F.2d 267, 272 (3d Cir. 1967). Because the Jameses' complaint did not allege fraudulent conduct, Antilles reasons that the separate entities cannot be treated as alter-egos, and

Antilles can be held liable for knowledge of what American Alliance knew and was doing is by piercing their respective corporate veils. We reject this proposition and rule that separate entities may share knowledge and information through common officers and directors without dissolving their independent corporate structures. The knowledge of an officer or director of one company can be imputed to another company of which he is also an officer or director where relevant in a negligence action. This is not a question of piercing the corporate veil and imputing liability from American Alliance to Antilles, rather the issue is whether information learned by an officer and director of Antilles in his capacity as an officer and director of American Alliance is information known corporately by Antilles and therefore subject to the duty to disclose under section 381. If the information should be disclosed, it makes no difference how Antilles gained knowledge of it, whether from other customers, the government, or its common links to American Alliance.

 In addition, Antilles contends for the first time that the admission of the complaint was unduly prejudicial. Antilles suggests that the jury was unduly confused after examining the complaint, since they may erroneously have concluded that the duty owed by the reinsurance broker was the same as the duty owed by the insurance agent to the insured. To justify reversal, prejudice must be based on more than mere suspicion. Riley v. Goodman, 315 F.2d 232, 235 (3d Cir. 1963). Because no prejudice or confusion is made obvious here by examination of the record, we find that Antilles has not demonstrated that miscarriage of justice resulted from the complaint's admission. Although Antilles now suggests that the introduction of the entire complaint was unnecessarily prejudicial or confusing to the jury, we note that Antilles made no request to the trial court to redact or otherwise summarize the contents of the complaint. We therefore reject this contention.

(4) *Acceptance of Frandelle Gerard as Expert Witness*

At trial, the Jameses used the expert testimony of Frandelle Gerard to establish that American Alliance, if the representations in its financial statement and reinsurance available were true, would not

---

the corporate veil cannot be pierced. As noted, this is not the issue presented here.

243

have had sufficient reinsurance in 1989 to pay claims and remain solvent in the event of a major disaster.[11] App. I at 136. Antilles questioned the adequacy of Ms. Gerard's credentials and background and argued that her testimony as an expert should have been limited to knowledge of duties of an insurance broker, not as an expert in reinsurance. The Jameses respond that Ms. Gerard was adequately familiar with reinsurance, cite the judge's high degree of discretion in this area, and note the limited testimony that Ms. Gerard offered. App. I at 131–35.[12] Further, the Jameses contend that Ms. Gerard's testimony only corroborated that of Antilles' own witness, Mr. Zack. We also note that the testimony is corroborated by the Bell Nicholson complaint.

 Rule 702 of the Federal Rules of Evidence states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702.

 The trial court has broad discretion regarding admission of expert evidence, and the judge's determination of competency of the expert is reversed only if there is an abuse of that discretion and the decision is manifestly erroneous. Salem v. United States Lines Co., 370 U.S. 31, 35 (1962), quoting Spring Co. v. Edgar, 99 U.S. 645, 658 (1879); Aloe Coal Co. v. Clark Equipment Co., 816 F.2d 110, 114 (3d Cir. 1987), cert. denied, 484 U.S. 853 (1987); Seese v. Volkswagenwerk A.G., 648 F.2d 833, 844 (3d Cir. 1981), cert. denied, 454 U.S. 867 (1981).

---

[11] Ms. Gerard was offered "as capable of rendering an opinion of whether or not American Alliance at anytime during 1989 had sufficient reinsurance, together with its reserves, to remain solvent had Hurricane Hugo struck" during that period. App. I at 139, 147–52.

[12] Ms. Gerard worked in the insurance field since 1980, starting as a secretary and moved up through all phases of the field to ultimately own her own company. App. I at 131–33. She studied economics, business, statistics, and accounting, but holds no degrees in those fields. Ms. Gerard submitted claims to reinsurance, but never analyzed the appropriate amounts of reinsurance for a company. She also testified that companies wishing to buy reinsurance usually go through expert reinsurance brokers.

■ While it may be true that reinsurance is a complex and highly technical issue, Antilles failed to cite any cases that negate the sufficiency of Ms. Gerard's qualifications to testify as an expert regarding whether or not American Alliance had sufficient reinsurance in 1989 to remain solvent after experiencing a hurricane such as Hugo. Antilles cites a Missouri case in which the reinsurance expert had a relevant degree and 35 years experience in reinsurance underwriting. Omaha Indem. Co. v. Royal American Managers, Inc., 777 F. Supp. 1488, 1491 (W.D. Mo. 1991). One accepted expert's qualifications, however, do not a minimum standard create. Ms. Gerard's testimony appears knowledgeable, direct, and clear. Furthermore, since Antilles had earlier deposed Ms. Gerard, it had full opportunity to counter her testimony by presenting its own expert witness. Moreover, she testified about the sufficiency of American Alliance's reinsurance, not the intricacies of the negotiation and inner workings of reinsurance treaties. In fact, Ms. Gerard's testimony corresponded to the testimony of Antilles' own witness, Mr. Zack. See Appellant's Reply Brief at 23 (acknowledging that Mr. Zack testified similarly as a fact witness). For these reasons, we rule that the trial judge did not abuse his discretion in admitting Ms. Gerard as an expert on the issue of foreseeability and therefore negligence of Antilles.

(5) *Admissibility of Herbert Zack's Testimony to Demonstrate Knowledge and State of Mind*

Antilles attempted to introduce the following deposition testimony of Herbert Zack, President of Antilles:

Q. Did you have any discussions with the financial examiners for the V.I. government subsequent to their examination of the American Alliance records?

A. The only discussions I had with them were when they left when they told us how pleased they were with what they found.

App. III at 669. The testimony was excluded on the Jameses' objection that it was hearsay.[13] Although Antilles made no representa-

---

[13] App. I at 10. Statements offered for the truth of the matter asserted to establish an individual's state of mind, here the financial examiners', if offered pursuant to Fed. R. Evid. R. 803(3) to indicate their "then existing mental, emotional, or physical condition" must be made by those same individuals, in this

245

tion on the record at trial of the grounds for its admission, Antilles now suggests that the testimony was not offered to prove that the examiners were pleased with their audit on American Alliance's financial condition, the truth of the matter asserted, pursuant to Rule 801, Fed. R. Evid. Rather, Antilles now asserts that it was trying to establish Mr. Zack's state of mind that as Antilles' President, he had independent and reliable knowledge that American Alliance was financially sound.

 If a statement is not offered for the truth of the matter asserted, it is not hearsay, and may be admissible.[14] For example, testimony may be admitted for the limited purpose of showing state of mind and understanding of a nondeclarant if the communication was made to a party who subsequently acted on it. United States v. Beecroft, 608 F.2d 753 (9th Cir. 1979); E.J. Stewart, Inc. v. Aitken Products, Inc., 607 F. Supp. 883, 898–99 (E.D. Pa. 1985), aff'd., 779 F.2d 41 (3d Cir. 1985). Unfortunately, the trial record presented on appeal does not indicate at what point, if ever, Antilles' present contention was made that the statement was not offered for the truth of the matter asserted. Not having been raised below, this issue is also not properly before this Court unless it constitutes plain error. See supra § A(3) (discussing the plain error standard).

 It is likely that the admission of Mr. Zack's excluded testimony would have damaged Zack's credibility rather than bolstered Antilles' defense. The Insurance Commissioner's Report of the company's financial condition dated September 1, 1989, admitted into evidence as Exhibit No. 17, as interpreted by Alan Bronstein's expert accounting testimony on cross-examination, gives a significantly different view of the condition of the company's books from Mr. Zack's testimony.[15] The excluded testimony further would have emphasized the commonality of the officers, directors

---

case, the Virgin Islands government insurance examiners. Fed. R. Evid. 803(3); United States v. Gomez, 927 F.2d 1530, 1535–36 (11th Cir. 1991).

[14] See Webb v. Fuller Brush Co., 378 F.2d 500 (3d Cir. 1967); but see United States v. Mandel, 437 F. Supp. 262, 263 (D. Md. 1977) (holding that only declarations made by the defendant-declarant, whose wife offered testimony of statements made in her presence, would be relevant to his state of mind).

[15] See App. IV at 764 (Insurance Commissioner's Report dated 9/1/89, comments demonstrating concern regarding exposure), App. I at 175 (admission of Exhibit No. 17 into evidence), App. II at 264–271 (Bronstein's cross-examination).

and shareholders of American Alliance and Antilles. We therefore find that any error from the Territorial Court's exclusion of this one sentence of Mr. Zack's testimony was harmless. In other words, it is "highly probable" that such error, if made, did not affect the outcome of the case based on our review of the entire proceedings before the trial court.[16]

B. *Application of the Collateral Source Rule*

The trial judge applied the collateral source rule to permit duplicate recovery by the Jameses of the $96,486 hurricane damage loss: once from Antilles and again from the authorized payment by the Virgin Islands Hurricane Hugo Insurance Claims Fund Program ("Hugo Fund").[17] Antilles contends that any amounts awarded to the Jameses should be reduced pro tanto by funds available and/or paid to them through the Hugo Fund on behalf of American Alliance. App. III at 701. The Jameses hail the court's application of the collateral source rule as appropriate on grounds of public policy.

The collateral source rule, as urged by the Jameses and applied by the trial court, may be found in Restatement (Second) of Torts § 920A(2) (1979):[18]

> Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.

Comment b. adds the following gloss:

> *Benefits from collateral sources.* Payments made or benefits conferred by other sources . . . do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there

---

[16] McQueeney v. Wilmington Trust Co., 779 F.2d 916, 923–28 (3d Cir. 1985); Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 53 (3d Cir. 1989); see Kotteakos v. United States, 328 U.S. 750, 762 (1946) (construing harmless error, the Court examined the proceedings in their entirety to balance the case as a whole).

[17] Payment of up to $100,000 toward losses due to the hurricane can be made under V.I. Code Ann. tit. 22, § 248d(a)(1).

[18] In the absence of local decisional or statutory law to the contrary, the Restatements of Law are used as the rules of decision in the Virgin Islands. V.I. Code Ann. tit. 1, § 4.

may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the torfeasor. . . . If the benefit was . . . established for him by law, [the plaintiff] should not be deprived of the advantage that it confers. *The law does not differentiate between the nature of the benefits so long as they did not come from the defendant or a person acting for him.* One way of stating this conclusion is to say that it is the tortfeasor's responsiblity to compensate for all harm that he causes, not confined to the net loss that the injured party receives (emphasis added).

Antilles argues, although somewhat inartfully, that another provision of the Restatement should be applied to credit any Hugo Fund payment against appellant's liability, namely, Restatement (Second) of Torts § 885(3) (1979):

A payment by any person *made in compensation of a claim for a harm for which others are liable* as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment (emphasis added).

Comment f. adds the following clarification:

Payments made by one who is not himself liable as a joint tortfeasor will go to diminish the claim of the injured person against others responsible for the same harm *if they are made in compensation of that claim*, as distinguished from payments from collateral sources such as insurance, sick benefits, donated medical or nursing services, voluntary continuance of wages by an employer and the like. These payments are commonly made by one who fears that he may be held liable as a tortfeasor and who turns out not to be. Less frequently they are made by a stranger, who wishes to compensate the plaintiff or to protect one tortfeasor against a possible judgment (emphasis added).

248

■ The pivotal distinction between these two Restatement provisions is the purpose for which the payment is made.[19] It is a direct benefit if the payment is made in compensation of that very claim for which the tortfeasor is liable (section 885(3), cmt. f.), which is treated as if coming from the tortfeasor or someone acting for him (section 920A, cmt. b.). The payment is a collateral benefit if made for a broader purpose to benefit all persons who suffer similar losses whether or not caused by the tortious conduct of another. This is in accord with Supreme Court instruction that we look to the intent or purpose for which the payments were made in determining whether benefits paid out of public funds should be treated as direct payments or compensation from a collateral source. Labor Board v. Gullett Gin Co., 340 U.S. 361 (1950). The Court held that the National Labor Relations Board was correct in not deducting unemployment compensation from its back-pay award, finding that these payments were collateral benefits because they "were not made to discharge any liability or obligation of the respondent [company], but to carry out a policy of social betterment for the benefit of the entire state [of Louisianna]." Id. at 364.[20]

We thus look to the statutory provisions establishing the Hugo Fund to determine whether the payment from that fund to the Jameses is more in the nature of a collateral or a direct benefit. The Virgin Islands Hurricane Hugo Insurance Claims Fund Program Act of 1990 ("Act"),[21] was enacted on September 6, 1990. In section 248, the Legislature found and declared the need to provide a

---

[19] When dealing with the typical kinds of social benefits legislation, there is usually little question that they are subject to the collateral source rule, e.g., workers compensation, unemployment compensation, social security benefits, welfare payments, pensions under special retirement acts. Restatement (Second) of Torts § 920A(2) cmt. c (1979). The treatment of other legislative benefits are not always so clear, as exemplified by the Hugo Fund.

[20] The employer contended that the benefits were direct benefits because the unemployment compensation fund was created in part by taxes paid by employers and the employer thus helped create that fund. The same reasoning would apply here since the insurance premium tax goes to pay off the bonds that were floated to fund the Hugo Fund pursuant to V.I. Code Ann. tit. 22 § 248c. See V.I. Code Ann. tit. 22 §§ 603(b) & (d)(1)-(4). The Supreme Court rejected this reasoning. Labor Board v. Gullett Gin Co., 340 U.S. 361, 364 (1950).

[21] V.I. Code Ann. tit. 22, §§ 248–249g (1993).

mechanism for the payment of certain insured claims under certain insurance policies

> to avoid excessive delays of payment and financial losses to claimants or policyholders because of the financial position, including the rehabilitation or conservatorship thereof, of insurers relating to the devastation wrought by Hurricane Hugo, and to promote public confidence and availability of insurance generally in the Virgin Islands. It is further declared that such purpose is a public purpose in all respects for the benefits of the Virgin Islands.

While this statement of legislative findings could possibly be read to include both purposes—to compensate for the damage for which Antilles is liable[22] and to benefit all policyholders in the Virgin Islands who suffered losses—we conclude that the dominant purpose for which the Hugo Fund was set up was "to carry out a policy of social betterment for the benefit of the entire [Virgin Islands],"[23] and not to discharge any liability or obligation of a tortfeasor such as Antilles.[24]

Since Antilles had no role in actually causing the physical damage the hurricane inflicted upon the Jameses, Antilles might be perceived as not really responsible for the $96,486 hurricane damage claim. The harsh fact remains that the jury found Antilles liable for 100% of the Jameses' damages, including the $96,486 owed by American Alliance. Whether or not the agency played any role in American Alliance's insolvency, Antilles is legally responsible for all damages flowing from its own negligence. Allowing a negligent insurance agency to escape full liability under these circumstances can be neither tolerated nor subsidized by the Hugo Fund. Moreover, crediting the amount of the payment from the Hugo Fund

---

[22] It could be read as setting up a fund to play the role of a "stranger, who wishes to compensate the plaintiff," that is, compensation from the Hugo Fund to a policyholder would be a direct payment, "a payment . . . made in compensation of a claim for a harm for which . . . (another is) liable." Restatement (Second) of Torts § 885(3) & cmt. f. (1979).

[23] Gullett Gin, 340 U.S. at 364.

[24] See Government of Virgin Islands v. Berry, 604 F.2d 221, 225 (3d Cir. 1979) ("All laws should receive a sensible construction," to avoid absurd or unjust results).

against Antilles' liability to the Jameses would be an unwarranted windfall in the sense contemplated by section 920A.[25]

In thus construing the Act, we have taken into consideration the Legislature's strong and explicit policy of nonduplication of recovery, since applying section 920A would appear to allow the Jameses to receive duplicate recoveries of the $96,486.[26] The Jameses will not realize a windfall, however, since the Government of the Virgin Islands is fully subrogated to rights of the Jameses for this tort claim against Antilles. Section 248e(a) declares the "effect of paid claims" to be that

> any person recovering under this program shall be deemed to have assigned his rights under the policy to the Government and the Government shall be deemed the beneficiary of such policy and *fully subrogated to the rights of such person to the extent of his recovery from the Government* (emphasis added).

The Act thus provides the mechanism for the trial court to order Antilles to pay directly to the Government the amount of its Hugo Fund payment to the Jameses, and the clear statutory prohibition against duplicate recovery is not violated.[27]

 The Jameses will thus be fully compensated for their losses: (1) payment from the Hugo Fund for the physical damage to

---

[25] As noted by the Third Circuit, the collateral source rule is punitive in nature. See Craig v. Y & Y Snacks, Inc., 721 F.2d 77, 83 (3d Cir. 1983). "[T]he position of the law [is] that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor." Section 920A cmt. b. "It is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives." Id.

[26] The Legislature prohibited the Government from suing the insured, the Jameses, for any Hugo Fund payments "except to the extent necessary and convenient to provide for nonduplication of recovery pursuant to section 248f." "Nonduplication of Recovery" is the title of section 248f, subsection (a) of which requires that an insured having a claim under his policy against his insurer must first exhaust his rights under the policy and "[a]ny amount payable on a Hurricane Hugo claim . . . shall be reduced by the amount of such recovery under the claimant's insurance policy." Subsection 248f(b) provides that any recovery from the Hugo Fund shall be reduced by the amount of recovery for the same damages from any other Virgin Islands agency, such as an insurance guaranty association, or from a federal agency or entity.

[27] That remedial statutes are to be construed liberally so as to further the legislative purpose is axiomatic. E.g., United States v. Ven-Fuel, Inc., 758 F.2d 741 (1st Cir. 1985); International Nutrition, Inc. v. U.S. Dept. of Health and Human Services, 676 F.2d 338 (8th Cir. 1982).

their property in the amount of the adjusted claim which American Alliance otherwise would have paid on its policy, and (2) payment from Antilles for the damages it caused the Jameses which differ from those covered by the Hugo Fund, that is, emotional distress, prejudgment interest, and attorneys fees awarded and affirmed by this Court. Antilles thus remains liable to compensate the Jameses for all the harm resulting from its negligence, and the rationale of the collateral source rule that the tortfeasor "compensate for all harm that he causes . . ." is fulfilled.[28] No one receives a windfall and the Hugo Fund is reimbursed as the Legislature intended.

C. *Loss of Use Damages*

Both Antilles and the Jameses agreed that up to June, 1990 was a reasonable time allowance for loss of use of the Jameses' house while rebuilding and that the $96,486 claim included compensation for such loss of use. App. III at 602–03. Because the Jameses were not able to complete the reconstruction until May, 1991,[29] the jury awarded $10,000 for the additional loss of use, which Antilles now contends was not legally founded. Antilles alleges that the fair property rental value of the loft in the two floor garage in which the Jameses were forced to reside after Hugo destroyed their house was the proper measure of damages. At trial, both parties agreed that "the ordinary measure of such damage[s] is the value of comparable housing during the period of such loss. App. II at 484; III at 595–98.

 More importantly, however, Antilles contends that the Jameses provided insufficient evidence to support an award of $10,000, and that the loss of use should therefore be vacated in its entirety. Vacatur is appropriate only if the record is void "of that minimum quantum of evidence from which a jury might reasonable afford relief." Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992). Although the Jameses would like us to reject Antilles' suggestion, they fail to point to any evidence in the record that supports a fair rental value of $10,000. Despite this Court's own examination of the record, we cannot find sufficient evidence that

---

[28] Restatement (Second) of Torts § 920A cmt. b (1979).

[29] App. I at 82T–82W. Plaintiffs applied for an SBA loan in November, 1989, and signed the papers for their SBA loan in March, 1990, but did not receive the money until October, 1990. App. I at 82T–82U.

demonstrates the value of comparable housing to support the jury award. App. I at 82U, 82AA (testimony); II at 483–84 (jury instructions). Although the record reflects that a housing shortage existed while the Jameses lived in their garage, no comparable rental values were presented. To assume that the jurors could take judicial notice of the rental values on St. Croix in the aftermath of the hurricane would be highly speculative. Based on the lack of supporting evidence, we are compelled to set aside the jury's $10,000 award for loss of use.

## D. *Award of Attorneys Fees*

Antilles asserts that this is a personal injury action and therefore, the Territorial Court's award of attorneys fees to the Jameses was in error. The Jameses would classify this suit as a tort action to vindicate their property interest in their home and right to have adequate insurance protection of it. While emotional distress may be incidental to a personal injury action, the Jameses contend that the mere award of damages for emotional distress is not conclusive that the action is for "personal injury." The Court agrees that the reinstated award for emotional distress is merely incidental to their fundamental action for negligence of the agent in failing to disclose information pertinent to insurance protection of their property.

■ V.I. Code Ann. tit. 5, § 541 provides that the court has the discretion to indemnify the prevailing party in all nonfrivolous cases by awarding attorneys fees, with the express exception of personal injury actions. V.I. Code Ann. tit. 5, § 541 (1967 and 1992 Supp.). Because the amount of the fee award is discretionary, it will only be reversed in a case of clear abuse of discretion. Lucerne Investment Company v. Estates Belvedere, Inc., 411 F.2d 1205 (3d Cir. 1969); Vitex Manufacturing Co. v. Wheatley, 12 V.I. 528 (D.V.I. 1975).

■ No dispositive caselaw exists which clearly defines this lawsuit for purposes of fee indemnification.[30] From a brief review

---

[30] Antilles presented a Kansas case in which tortious misrepresentation was considered a personal injury for damage purposes. Hill v. United States, 733 F. Supp. 88, 89–90 (D. Kan. 1990). The Jameses cited contrary Illinois holdings which explained that although tortious misrepresentation may be a personal injury in the broad sense, it was not an "injury to the person". Berghoff v. R.J.

of the prevailing holdings in this area, it does not appear that this type of suit has ever been classified as a personal injury action, even though an action for emotional distress has been referred to as personal injury action. In re Clapacs, 567 N.E.2d 1351, 1354 (Ohio Misc. 1989); Kilduff v. Adams, Inc., 593 A.2d 478, 490 (Conn. 1991). Moreover, the emotional distress inflicted on the Jameses was merely consequential in nature and an incidental portion of the jury's award. Antilles has not adequately demonstrated that this Court is obligated to set aside the lower court's award. As a result, the award for the Jameses' attorneys fees is left intact, and there is no need to recompute it since the emotional distress damages were excluded from the trial court's fee award. See infra. section E (discussing the emotional distress award).

### E. *Judgment Notwithstanding the Verdict on Issue of Emotional Distress*

Antilles unsuccessfully moved twice before trial to dismiss the Jameses' claims of emotional distress. App. I at 4–6. At the close of plaintiffs' case-in-chief, Antilles' motion for a directed verdict regarding plaintiffs' claim for emotional distress was also denied (App. I at 186) and the motion was not renewed at the end of the evidence or before the verdict was entered. App. II at 363, 381, 385. The trial judge nevertheless granted Antilles' post-trial motion for judgment notwithstanding the verdict ("JNOV") and set aside the emotional distress award. The judge based his decision on insufficient evidence that the distress experienced was a result of Antilles' failure to pay the claim, as distinguished from the general trauma suffered by everyone surviving and rebuilding after the hurricane. The court also noted that the award was without basis, "both in terms of the award itself as well as the size of the award." App. III at 715–16. The Jameses now ask this court to vacate the order granting JNOV pursuant to Fed. R. Civ. P. 50(b). Such claimed errors of law are subject to plenary review.

 Fed. R. Civ. P. 50(b) clearly states that a judge may reconsider a motion for judgment as a matter of law after entry of judgment only if the motion was renewed or "made at the close of all

---

Frisby Manufacturing Co., 720 F. Supp. 649, 652–54 (N.D. Ill. 1989); Gladich v. Navistar Int'l Trans. Corp., 703 F. Supp. 1331, 1334 (N.D. Ill. 1989). Even still, Indiana defines personal injury as "any affront or detriment to body, psyche, or reputation or liberty", distinguishing it from injury to property rights. Merimee v. Brumfield, 397 N.E. 2d 315, 318 (Ind. App. 1979).

the evidence." In the Notes of the Advisory Committee on Rules, the 1963 Amendments state that, "[a] motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence." Fed. R. Civ. P. 50(b), Notes of the Advisory Committee on Rules, 1963 Amendments. The main purpose of the rule is to give opposing counsel an opportunity to cure the defect in proof and to prevent a litigant from gambling on the jury verdict and later questioning the sufficiency of the evidence on appeal. Quinn v. Southwest Wood Products, Inc., 597 F.2d 1018, 1024–25 (5th Cir. 1979).

 The Third Circuit requires strict compliance with this rule, since the introduction of evidence by the defendant after the denial of the request for directed verdict constitutes a waiver of any error if not renewed at the close of all evidence. Yohannon v. Keene Corp., 924 F.2d 1255, 1263 (3d Cir. 1991) (stating that "Gebhardt remains the law of this Circuit unless overruled in banc"); Beebe v. Highland Tank and Manufacturing Company, 373 F.2d 886, 888 (3d Cir. 1967), cert. denied, 388 U.S. 911 (1967); Gebhardt v. Wilson Freight Forwarding Co., 348 F.2d 129, 132 (3d Cir. 1965).[31]

After Antilles' motion for directed verdict was denied at the close of plaintiff's case, Antilles presented a substantial amount of testimony in its case. In addition, it was the trial judge, not Antilles, who noted Antilles' objection regarding emotional distress during discussions of the jury instructions and of the verdict forms. Even then, Antilles did not renew its motion or offer any further com-

---

[31] The Third Circuit has not followed other jurisdictions which have held that technical noncompliance is not fatal to a Rule 50(b) motion if the evidence following the denial was brief and inconsequential, or where the purposes of Rule 50(b) have been satisfied. Boyton v. TRW, Inc., 858 F.2d 1178, 1186 (6th Cir. 1988); Villanueva v. McInnis, 723 F.2d 414, 417 (5th Cir. 1984); 5A Moore's Federal Practice § 50.08 at 50–89–92 (1992 and 92–93 Supp.). Exceptions, when granted, emphasize the movant' s several attempts throughout the trial to obtain a directed verdict. Evaluations of objections to relevant jury instructions may also indicate that the judge was aware of the objection's basis. Jack Cole Co. v. Hudson, 409 F.2d 188, 191 (5th Cir. 1969). The Third Circuit explicitly rejected this proposition, however, noting that, "the constitutional and procedural issues are so important that we are unwilling to make the supposition that the bench and the adverse party have sufficient notice." Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken, 536 F.2d 9, 12, n.7 (3d Cir. 1976) (rejecting the Fifth Circuit's approach in Jack Cole Co. v. Hudson, supra).

ment. This Court is thus compelled by the established law of this jurisdiction to disregard Antilles' objections of record and its untimely request for JNOV. The Territorial Court acted outside of its authority when it ruled that this portion of the jury's award was based on legally insufficient evidence. Fed. R. Civ. P. 50(b), Notes of the Advisory Committee on Rules, 1991 Amendments.

 We would undoubtedly agree with the jury if we reached the merits.[32] Since the JNOV was granted contrary to the law of the Third Circuit, and the rules explicitly require a motion for a directed verdict made at the close of all the evidence, which did not occur in this case, the JNOV must now be set aside. Thus, the jury's award for emotional distress in the amount of $20,000 to Mr. James and $20,000 to Mrs. James is reinstated.

F. *Award of Prejudgment Interest*

 The final issue on appeal is the Territorial Court Judge's denial of prejudgment interest on the Jameses' $96,486 loss. The Jameses assert that they are entitled to prejudgment interest because the amount of the claim was ascertainable and became payable as of December 24, 1989. Award of judgment interest is permitted on "all monies which have become due." V.I. Code Ann tit. 11, § 951(a)(1). Award is authorized, however, "only where the amount due is in money and therefore easily ascertainable." Remole v. Sullivan, AIA, 20 V.I. 434, 438 (Terr. Ct. 1984). While the date that payment becomes due is often disputed, the court has discretion to award prejudgment interest to avoid injustice. Restatement (Second) of Torts § 913(1)(b). Interest is sometimes

---

[32] The Restatement considers several hours worrying about securing shelter to be a potential element of damage recovery. Restatement (Second) of Torts § 905, cmt. e, illus. 8. Antilles' suggestion that in the absence of physical injury, emotional distress is only compensable if Antilles' conduct was intentional or extremely outrageous is rejected. If appellees only recovered damages for emotional distress, appellants would be correct in asserting that the award would not be permitted pursuant to the Restatement. Restatement (Second) of Torts § 436A. Since emotional distress was only a part of the damages awarded, this section is inapplicable.

Antilles also attempts to reframe the breach as a violation of fiduciary duties, but because the parties and the court repeatedly refer to the action as one of negligence, recovery under the Restatement section regarding breach of fiduciary duties would be incidental to the more relevant issue of negligence. Restatement (Second) of Torts § 874; App. III at 599.

256

awarded as an alternative or in addition to an award for loss of use, although the two are often combined. Id. at cmt. a; Restatement (Second) of Torts § 927(2)(c) & cmt. o.

Although the Jameses cite several cases construing laws of other jurisdictions that permit prejudgment interest as a matter of right for liquidated claims, the Territorial Court concluded that such interest would be inappropriate under the circumstances of this case based, in part, on the loss of use award. "Moreover, this is not a situation in which the defendant can fairly be said to have delayed the day of (legal) judgment." Order dated June 28, 1991; App. III at 737–38. The trial judge also premised his denial on the fact that the matter was expeditiously litigated, that plaintiffs did not recover in full, and that Antilles' liability "was secondary to that of American Alliance." In its denial, the judge stated that "such an award would not avoid an injustice but rather would create one." App. III at 737–38.

■ We note that the primary reason cited by the lower court for denying the interest, namely, the Court's $10,000 award for loss of use, is no longer a factor. In addition, it confuses the issue to attempt to rank the legal, tort liability of Antilles with the contractual responsibility of American Alliance to pay the $96,486 liquidated property damages claim. The two obligations are not comparable. Finally, expediency with which the claim was litigated is immaterial because the $96,486 damage calculation was fixed since the date that American Alliance accepted the Proof of Loss. Since either loss of use or prejudgment interest is appropriate, and no compensation for loss of use is permitted, it is equitable to award prejudgment interest. This issue is therefore remanded to the Territorial Court for calculation of prejudgment interest from December 24, 1989, the date the amount of the loss was adjusted and agreed to by the insurer,[33] to the date of final judgment.

## CONCLUSION

Upon consideration of all the issues presented on appeal, and based on the foregoing analysis, the Territorial Court's application of the collateral source rule, its award for loss of use, its grant of

---

[33] Since these are legal matters that the trial judge articulated and the amount of prejudgment interest is determinable, there is no need to resubmit this to the trial court other than for calculation of the award.

257

JNOV, and its denial of prejudgment interest require remedial action. Because all of these issues can be appropriately corrected by the trial court based on the existing trial record, retrial is not necessary. In accord with our holding on the collateral source rule, we must reverse the judgment and remand the matter to the Territorial Court with instructions to reduce the judgment by the amount paid or payable to the Jameses out of the Hurricane Hugo Insurance Claims Fund.[34] Loss of use damages must also be deducted from the amount of the judgment. Furthermore, the partial judgment notwithstanding the verdict must be set aside and the award for emotional distress must be reinstated.[35] Finally, prejudgment interest shall be calculated and added to the judgment.[36] In all other respects, the judgment of the Territorial Court is affirmed. An appropriate order will be entered.

---

[34] See supra section B.
[35] See supra section E.
[36] See supra section F.